Blake D. Miller (4090)
James W. Anderson (9829)
**MILLER GUYMON, P.C.**
165 Regent Street
Salt Lake City, Utah 84111
Telephone: (801) 363-5600
Facsimile: (801) 363-5601
e-mail: miller@millerguymon.com
         anderson@millerguymon.com

---

### IN THE UNITED STATES BANKRUPTCY COURT

### FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>**WOLF CREEK PROPERTIES, LC**<br><br>Debtor. | **Bankruptcy Case No. 10-27816<br>Chapter 11**<br><br>**Judge Joel T. Marker**<br><br>**(Filed Electronically)** |

---

### MOTION TO APPROVE SALE OF WATER ASSETS

---

Wolf Creek Properties, LC ("Debtor" or "Seller"), pursuant to 11 U.S.C. § 363(b), (f) and (m), and Fed. R. Bankr. P. 2002, 6004 and 9014, seeks entry of an order (the "Sale Order"), in the form attached as Exhibit "A", authorizing and approving the sale (the "Sale"), outside the ordinary course of business, of certain parcels of real property and easements underlying water delivery and storage facilities and the Debtor's interest in 165 shares of stock in Wolf Creek Irrigation Company[1] (the "Assets") to Wolf Creek Sewer Improvement District, a body politic and political subdivision of the State of Utah ("SID" or "Buyer"), pursuant to two Asset Purchase Agreements,  copies of which are attached hereto as Exhibit "B" (the "Water Co.

Agreement"), and Exhibit "C" (the "Conservancy Agreement"), subject to higher and better offers, free and clear of all interests, liens, claims and encumbrances with any all such interests, liens, claims and encumbrances to attach to the proceeds of the Sale, and that the order approving the Sale be effective upon entry pursuant to Rule 6004(h).  In support of this Motion, the Debtor respectfully represents as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§1408 and 1409.

## BACKGROUND

2.      On June 9, 2010 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

3.      The Debtor is a Utah limited liability company with its principal place of business in Eden, Utah.  Among other assets, the Debtor owns the real property which comprises the Wolf Creek golf course and Wolf Mountain ski resort facilities.

4.      The Debtor has a number of secured and unsecured creditors, and is continuing to operate its resort business as a debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

5.      The Debtor is the one hundred percent owner of Wolf Management, Inc.  Wolf Management, in turn, is the owner of Wolf Creek Water Conservancy, Inc. ("Conservancy") and Wolf Creek Water Company, Inc. ("Water Co.").  Conservancy provides irrigation water to the

---

[1] The Debtor, Conservancy, and the State of Utah hold interests in this stock, as discussed below.

Debtor's golf course and sells irrigation water to local residents and property owners of the greater Wolf Creek community.  Water Co. provides the Debtor with culinary water and also sells culinary water to residents and third party property owners.

6.      Conservancy and Water Co. own the equipment, water rights and infrastructure used to distribute secondary and culinary water to its users and to bill and collect revenue for such water.  The real estate on which such infrastructure is located, however, such as storage ponds, is owned by the Debtor.

7.      The Debtor no longer has a need to own subsidiaries involved in the water business.   SID, as a governmental entity, is currently involved in the secondary water business for the Wolf Creek area and desires to enter the culinary water business as well.  Both SID and the Debtor (a substantial landowner in the area) believe that having the water delivery systems held and operated by a governmental entity is in the best interests of the Debtor, adjoining property owners and residents.

8.      The Debtor and Conservancy have agreed, subject to Court approval, to sell the culinary and secondary water business to SID for a cash purchase price of Three Million Five Hundred Fifty Thousand Dollars ($3,550,000.00).  This purchase price is subject to two "hold back" provisions.  For the Conservancy sale, $200,000 shall be held back pending performance by the Debtor of its obligation to construct certain water delivery improvements on the golf course, such as a pump station and related facilities.  For the Water Co. sale, $4,859.52 shall be withheld pending reconveyance of the underlying deed of trust on approximately 0.25 acres held by American First Credit Union ("AFCU"), discussed below.

9.    Both agreements require the execution of water rights agreements providing the Debtor with its water needs after the sale of the two water companies.  Such agreements are attached to the respective purchase agreements.

10.    With respect to the property owned by the Debtor, there are four creditors that hold liens against the property to be sold to SID, as follows:

a.    Zions First National Bank ("Zions").  Zions holds a deed of trust over the golf course and some adjoining undeveloped land – totaling approximately 344 acres.  Contemplated to be transferred to the SID include (i) the main irrigation reservoir (4.8 acres), (ii) a golf course irrigation pond (6.25 acres) and a storage reservoir commonly known as "Lake Wade" (1.65 acres).  The underlying real estate for these ponds is subject to the Zions deed of trust.

b.    American First Credit Union ("AFCU") holds a deed of trust on approximately 566 acres of real estate.  A portion of the real property underlying AFCU's deed of trust and subject to the sale to SID is a 0.25 acre portion on which the Crooked Spring Well and tank are located.

c.    The MacFarlane Family Trust holds a trust deed on 74.5 acres, which includes a 10 acre lake.  This lake is to be conveyed to the SID as part of the secondary water system.

d.    State of Utah, Board of Water Resources (the "Board") holds an interest in 157.89 shares in Wolf Creek Irrigation Company, as well as other equipment and assets, pursuant to two loan agreements: one with Conservancy and one

with Water Co.  Water Co. owes the Board approximately $90,000, and Conservancy owes the Board approximately $557,161.

11.    As part of the sale to the SID, the Debtor proposes to address the liens and interests of the foregoing creditors as follows:

     a.    Zions lien shall attach to the proceeds of sale in the amount of $69,698, plus interest at the contract rate of the Zions' obligation.  This sum shall be treated as cash collateral under 11 U.S.C. § 363.  This sum represents the pro rata value of the property to be sold to SID subject to the Zion's trust deed based on the loan to value ratio of the total Zion's indebtedness to the total value of its real property collateral.  The total value of Zions' collateral is no less than $4,000,000, and its claim is estimated to be $1,850,000, yielding a 46% LTV.  The pro rata value of the property sold equals $150,698.  Alternatively, in exchange for a reconveyance of its trust deed on the property sought to be conveyed to SID, Zions may choose to accept a security interest in the new secondary Water Right Agreement pursuant to Exhibit "D."  Should Zions elect to obtain a security interest in the secondary Water Right Agreement, Zions shall served written notice of such election to Debtor's counsel on or before January 7, 2011.

     b.    AFCU's lien shall attach to the proceeds of sale in the amount of $4,859.52, plus interest at the contract rate of the AFCU obligation.  This sum shall be treated as cash collateral under 11 U.S.C. § 363.  This sum represents the pro rata value of the property to be sold to SID subject to the AFCU trust deed

based on the loan to value ratio of the total AFCU's indebtedness to the total value of its real property collateral. The total value of AFCU collateral is no less than $19,640,000, and its claim is estimated to be $11,000,000, yielding a 51% LTV. The pro rata value of the property sold equals $9,559.99.

    c. MacFarlane shall be paid its claim and shall be required to execute a full reconveyance of it trust deed.

    d. The Board shall be paid its claim in full and shall be required to execute a full assignment or release of any assets it is holding which belong to the Debtor, Conservancy, and/or Water Co.

12. Following the closing, the Debtor shall cause the two water companies and Wolf Management to dissolve. This will include payment of the obligations of such companies. The principal obligation to be paid by the water companies, plus the payments to secured creditors outlined herein, is approximately $1,716,859, as outlined in Exhibit "E". Following payment of such obligations, the remaining net monies will be upstreamed to the Debtor. The Debtor anticipates that the funds remaining for distribution to the Debtor from the water companies will be approximately $1,600,000 after determining final payoffs with interest and water companies' expenses.

## APPLICABLE AUTHORITY

13. Section 363(b)(1) authorizes the Debtor to sell, other than in the ordinary course of business, property of the estate with Court approval.

14. A debtor in possession may sell property of the estate outside the ordinary course of business. 11 U.S.C. §§ 363(b)(1) and 1107(a). A Chapter 11 debtor may sell all or

substantially all of its assets outside of a plan of reorganization.  *See, In re General Motors Corp.,* 407 B.R. 463 (Bankr. S.D.N.Y. 2009).  In order to approve a sale of a debtor's assets outside the ordinary course of business, there must exist: (1) a sound business reason for the sale; (2) adequate and reasonable notice to interested parties, including the sale terms and the Debtor's relationship with the buyer; (3) a fair and reasonable sale price; and (4) good faith on the part of the buyer.  *See In re Medical Software Solutions*, 286 B.R. 431, 439-40 (Bankr. D. Utah 2002). Once a debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action was in the best interests of the company."  *In re Johns-Manville Corp.,* 60 B.R. 612, 615-616 (Bankr. S.D.N.Y.) ("a presumption of reasonableness attaches to a Debtor's management decisions").  The court, however, is not to substitute its business judgment for that of the debtor. *See, e.g., In re Ionosphere Clubs, Inc.,* 100 B.R. 670, 676 (Bankr. S.D.N.Y. 1989).

15.    A sound business reason exists for the proposed sale.  As to the specific assets of the Debtor, the real estate to be sold comprises only a very small fraction of the real estate owned by the Debtor.  The sale of such real estate, however, is critical to the ability to convert the water company assets into cash.  As to the sale and anticipated dissolution of the water companies, operation of water companies is not in the Debtor's core business model – that of resort operations and development.  The SID is a natural purchaser of the companies.  There does not exist a large number of potential purchasers of the water companies.  The Debtor believes that the SID is an ideal purchaser.  Placing the responsibility of water delivery in the hands of an improvement district, as opposed to private ownership, increases the reliability of such water

delivery and consequently, the value to property owners (such as the Debtor) and residents. The water companies represent a significant value to the Debtor and the monetization of such asset in the form of a sale to the SID is a benefit to the estate. The purchase price is fair and reasonable. Conversion of the water companies into cash provides the estate with much needed resilience and flexibility. In addition, through the Water Supply Agreements, the Debtor will continue to have access to needed water.

16. Similarly, payment of the MacFarlane obligation is the product of the Debtor's good business judgment. In order to consummate the water company sales, it is necessary to transfer the reservoir subject to the MacFarlane Deed of Trust. At the time the MacFarlane obligation was incurred, the Debtor anticipated a sale of one of more of the water companies. Accordingly, this obligation is specifically due on such sale. If payment is not made, a substantial interest rate of 18% per annum is due on the unpaid balance. Since there is adequate collateral value to sustain such interest, failure to pay this obligation will eat into the value of unsecured assets available to the estate. In addition, contrary to the situation of Zions and AFCU, the real property sought to be conveyed to SID subject to the MacFarlane deed of trust constitutes a significant portion of that collateral.

17. The purchase agreements are the product of good faith.[2] The Debtor has spent many months in negotiations with the SID. The purchase agreements are the result of many months of arms-length negotiations. There is no collusion or attempt to take advantage of others. *See, e.g., In re Ewell,* 958 F. 2d 276 (9th Cir. 1992). In addition, there is no special treatment to insiders, but the estate benefits as a whole.

18.     It has long been recognized that bankruptcy courts have the power to authorize the

sale of property free of liens with the liens attaching to the proceeds, with or without the consent

of the lienholder.  As set forth in §363(f), a debtor may sell estate property free and clear of any

liens, claims and encumbrances if:

> (1)     applicable non-bankruptcy law permits the sale of such
> property free and clear of such interest;
>
> (2)     such entity consents;
>
> (3)     such interest is a lien and the price at which such property
> is to be sold is greater than the aggregate value of all liens on such
> property;
>
> (4)     such interest is in bona fide dispute; or
>
> (5)     such entity could be compelled, in a legal or equitable
> proceeding, to accept a money satisfaction of such interest.

19.     The import of section 363(f) is that liens and interests in property to be sold

should be adequately protected.  *In re Johns-Manville Corp.,* 837 F.2d at 94.  In sales, the most

common form of adequate protection is by attaching the liens to the proceeds of the sale.  *In re

WPRV-TV, Inc.,* 143 B.R. 315 (D.P.R. 1991).

20.     Here, the Debtor proposes to sell only a very small percentage of the collateral of

Zions and AFCU.  Courts have approved sales of portions of collateral, as long as the secured

creditor is adequately protected.  *See, In re WPRV-TV, Inc.,* 143 B.R. 315, 319-320 (D.P.R.

1991); *In re 18th Avenue Dev. Corp.,* 14 B.R. 862 (Bankr. S.D. Fla. 1981).  Both Zions and

AFCU have a substantial equity cushion – approximately twice the value of the subject real

estate.  The sales of these small pieces of collateral will not materially affect the value of either

---

[2] Lowell Peterson is one of the five members of the Debtor's board of directors, and he is also a member of the

secured creditor's collateral.  In any event, by allowing the liens of Zions and AFCU to attached to a pro rata portion of the sales proceeds as outlined above, the claims of both creditors are adequately protected in that their respective equity cushions are maintained.

21.     Finally, it is necessary that the Sale Order be effective immediately upon entry in order to comply with SID's lender's timeline to close this transaction.  The SID's lender has its funding commitment through January 22, 2011, only three days after the hearing on this motion.  Therefore, the Debtor respectfully requests that the Court use its authority under Rule 6004(h) to make the Sale Order effective upon entry.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court enter the Sale Order, substantially in the form attached as Exhibit "A", effective immediately upon entry pursuant to Rule 6004(h), approving the Sale, and authorizing the Debtor to complete any and all tasks necessary to effectuate and close the Sale, pursuant to the Agreement.

DATED this 20th day of December, 2010.

MILLER GUYMON, P.C.

/s/ Blake D. Miller_____
Blake D. Miller
James W. Anderson

Attorneys for the Debtor

---

SID's board of directors.  Mr. Peterson did not vote on this matter.