Blake D. Miller (4090)
James W. Anderson (9829)
**MILLER GUYMON, P.C.**
165 Regent Street
Salt Lake City, Utah 84111
Telephone: (801) 363-5600
Facsimile: (801) 363-5601
E-mail: miller@millerguymon.com
          anderson@millerguymon.com

*Counsel for the Debtor and Debtor in Possession*

Michael R. Johnson (7070)
Douglas M. Monson (2293)
Brent D. Wride (5163)
**RAY QUINNEY & NEBEKER P.C.**
36 South State Street, 14th Floor
P.O. Box 45385
Salt Lake City, Utah  84145-0385
Telephone:  (801) 532-1500
Facsimile:  (801) 532-7543
E-mail: mjohnson@rqn.com
          dmonson@rqn.com
          bwride@rqn.com

*Counsel for the Unsecured Creditors Committee*

IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>WOLF CREEK PROPERTIES, LC,<br><br><br>Debtor-in-Possession. | **Bankruptcy Case No 10-27816**<br>Chapter 11<br><br>Honorable Joel T. Marker<br><br>[Filed Electronically] |

***SECOND AMENDED JOINT PLAN OF REORGANIZATION OF THE DEBTOR AND THE UNSECURED CREDITORS COMMITTEE DATED MARCH 21, 2012***

## **TABLE OF CONTENTS**

**ARTICLE I.** DEFINITIONS AND INTERPRETATION ............................................................. 9

A.      DEFINITIONS .............................................................................................................. 9

     B.      INTERPRETATION; APPLICATION OF DEFINITIONS AND RULES
OF CONSTRUCTION ............................................................................................ 23

**ARTICLE II.** TREATMENT OF UNCLASSIFIED CLAIMS ................................................. 23

     2.1    *Administrative Expense Claims.* ............................................................................ 23

          (a)    Time for Filing Administrative Expense Claims. ..................................... 23

          (b)    Allowance of Administrative Expense Claims. ........................................ 23

          (c)    Payment of Allowed-Administrative Expense Claims. ............................ 24

     2.2    *Priority Tax Claims.* ............................................................................................. 24

          (a)    Payment of Priority Tax Claims. ............................................................. 24

     2.3    *United States Trustee Quarterly Fees and Other Statutory Fees.* ........................ 24

          (a)    Payment of U.S. Trustee Fees. ................................................................. 24

**ARTICLE III.** CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS ..................... 25

     3.1    *Classification.* ...................................................................................................... 25

          (a)    Classification Rules. ................................................................................. 25

          (b)    Classification Rules. ................................................................................. 25

          (c)    Table of Classes. ...................................................................................... 25

**ARTICLE IV.** TREATMENT OF CLAIMS AND EQUITY INTERESTS .............................. 26

     4.1    *Class 1 – Employee Claims* .................................................................................. 26

          (a)    Classification ............................................................................................ 26

          (b)    Treatment. ................................................................................................. 26

     4.2    *Class 2 – Non-Tax Priority Claims* ...................................................................... 26

     (a)    Classification.................................................................... 26

     (b)    Treatment. ...................................................................... 26

4.3    *Class 3 — Secured Claim of America First Federal Credit Union* ..................... 27

     (a)    Classification.................................................................... 27

     (b)    Treatment. ...................................................................... 27

          (1)    Retention of Liens......................................................... 27

          (2)    Application of America First's Cash Collateral............................ 27

          (3)    Optional Treatment:  Abandonment of America First
                Collateral With Right to Assert Deficiency Claim, or Estate
                Auction Sale by Estate Auctioneer with Reserve Price and
                With No Deficiency Claim. ........................................... 27

4.4    *Class 4 — Secured Claim of the Farm Bureau* ..................................... 31

     (a)    Classification.................................................................... 31

     (b)    Treatment. ...................................................................... 31

          (1)    Retention of Liens......................................................... 31

          (2)    Application of the Farm Bureau's Cash Collateral....................... 31

          (3)    Optional Treatment:  Abandonment of the Farm Bureau's
                Collateral With Right to Assert Deficiency Claim, or Estate
                Auction Sale by Estate Auctioneer with Reserve Price and
                With No Deficiency Claim. ........................................... 31

4.5    *Class 5 — Secured Claim of Zions First National Bank* ...................... 35

     (a)    Classification.................................................................... 35

     (b)    Treatment. ...................................................................... 35

          (1)    Retention of Liens......................................................... 35

          (2)    Optional Treatment:  Abandonment of Zions Bank's
                Collateral With Right to Assert Deficiency Claim, or Estate
                Auction Sale by Estate Auctioneer with Reserve Price and
                With No Deficiency Claim. ........................................... 35

4.6    *Class 6 — Secured Claim of Capon Capital, LLC*................................. 39

(a)    Classification...................................................................... 39

(b)    Treatment. ......................................................................... 39

4.7    *Class 7 — Secured Claim of Wolf Creek First Mortgage Investors, L.P.* ............ 40

(a)    Classification...................................................................... 40

(b)    Treatment. ......................................................................... 40

(1)    Retention of Liens........................................................ 40

(2)    Optional Treatment:  Abandonment of the Wolf Creek
Investors Collateral With Right to Assert Deficiency Claim,
or Estate Auction Sale by Estate Auctioneer with Reserve
Price and With No Deficiency Claim. .......................... 41

4.8    *Class 8 — Secured Claim of Randy Marriott Construction* ................................ 44

(a)    Classification...................................................................... 44

(b)    Treatment. ......................................................................... 45

4.9    *Class 9 — Secured Claims of Weber County* ......................................................... 46

(a)    Classification...................................................................... 46

(b)    Treatment. ......................................................................... 46

(1)    Allowance of Weber County Secured Claims. ............................ 46

(2)    Retention of Liens........................................................ 46

(3)    Payment of Weber County Claims. ............................... 46

4.10    *Class 10 — Secured Claim of the Weber Basin Water Conservancy
District* ................................................................................................ 46

(a)    Classification...................................................................... 46

(b)    Treatment. ......................................................................... 46

(1)    Allowance of Weber Conservancy District Secured Claim.......... 47

(2)    Abandonment of the Weber Conservancy District
Collateral........................................................................ 47

4.11    *Class 11 — Secured Claims of Ford Credit.* ........................................................ 47

4

(a) Classification...................................................................... 47

(b) Treatment. ........................................................................ 47

    (1) Retention of Liens...................................................... 48

    (2) Disposition of Ford Credit Collateral. ......................... 48

4.12 *Class 12 — Alleged Secured Claims of Suzanne Roberts, SCR Investments, Inc., Estate of Steven Roberts, and Roberts Living Trust.* ................... 48

(a) Classification...................................................................... 48

(b) Treatment. ........................................................................ 48

4.13 *Class 13 — Unsecured Claims* ............................................... 49

(a) Classification...................................................................... 49

(b) Treatment. ........................................................................ 49

4.14 *Class 14 — Equity Interests* ................................................. 49

(a) Classification...................................................................... 49

(b) Treatment. ........................................................................ 49

**ARTICLE V.** IDENTIFICATION OF CLAIMS AND EQUITY INTERESTS IMPAIRED AND NOT IMPAIRED BY THE PLAN ................... 50

5.1 *Impaired and Unimpaired Classes.* ........................................ 50

5.2 *Controversy Concerning Impairment.* .................................... 50

**ARTICLE VI.** ACCEPTANCE OR REJECTION OF PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS ................... 50

6.1 *Impaired Classes to Vote on Plan.*......................................... 50

6.2 *Acceptance by Class of Creditors and Holders of Equity Interests.*.................... 50

6.3 *Cramdown.*......................................................................... 51

**ARTICLE VII.** MEANS FOR IMPLEMENTATION .............................. 51

7.1 Implementation of the Plan...................................................... 51

7.2 Further Implementation of the Plan. ......................................... 51

7.3     Preservation of Causes of Action and Retained Claims and Defenses. ................ 55

7.4     Compromise and Settlement. ................................................................................ 55

7.5     LLC Existence and Structure of the Reorganized Debtor. .................................. 56

7.6     Terms of Injunctions or Stays. ............................................................................ 56

7.7     Further Assurances. .............................................................................................. 56

7.8     Effects of Appeal. ................................................................................................ 57

7.9     Exemption from Certain Transfer Taxes and Recording Fees. ............................ 57

7.10    Termination of Committee. .................................................................................. 57

**ARTICLE VIII.** THE REORGANIZED DEBTOR SUBCOMMITTEE AND THE
REORGANIZED DEBTOR BOARD OF MANAGERS ................................................. 57

8.1     Reconstituted Board of Managers for the Reorganized Debtor and
Creation of the Reorganized Debtor Subcommittee. ........................................... 57

8.2     Reimbursement of Out of Pocket Expenses of the Reorganized Debtor
Subcommittee Members. ...................................................................................... 60

8.3     Exculpation; Limitation of Liability. ................................................................... 60

**ARTICLE IX.** PROVISIONS GOVERNING DISTRIBUTIONS AND OBJECTIONS ........... 62

9.1     Objections to Claims. ........................................................................................... 62

        (a)     Claims Objection Deadline. ...................................................................... 62

        (b)     Authority. .................................................................................................. 62

9.2     Estimation of Disputed Claims. ........................................................................... 63

9.3     Methods of Distribution Under the Plan. ............................................................. 63

        (a)     Manner of Payments Under the Plan. ........................................................ 63

        (b)     Distribution of Unclaimed Property. ......................................................... 63

        (c)     Disposition of Unclaimed Property. .......................................................... 63

        (d)     Accounts. ................................................................................................... 63

(1)  Initial Distribution – Allowed Administrative Expenses, Allowed Non-Tax Priority Claims, and Allowed Claims in Class 1..........................................................................64

(2)  Disputed Claims Reserve..................................................64

(3)  Class 14 Equity Interests Excluded from Disputed Claims Reserve Account. ..........................................64

(e)  Additional Distributions...........................................................64

(1)  Distributions on Disputed Claims Which Become Allowed Claims. ..........................................................64

(f)  Final Distribution of Cash..........................................................65

(g)  Investments of Cash. ................................................................65

(h)  Distribution Procedures. ..........................................................65

9.4  Setoff Rights. ...........................................................................65

**ARTICLE X.** EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...........................66

10.1  Rejection of Contracts and Leases.........................................66

10.2  Bar to Rejection Damages. ....................................................66

10.3  Assumption of Specific Contracts and Leases.......................66

10.4  Insurance Policies. .................................................................67

10.5  Cure of Defaults. ....................................................................67

**ARTICLE XI.** POST EFFECTIVE DATE NOTICES TO CREDITORS AND OTHER INTERESTED PARTIES .........................................................................67

11.1  Notices to Creditors and Other Interested Parties.................67

**ARTICLE XII.** EFFECT OF CONFIRMATION ....................................................68

12.1  No Effect on Criminal, Tax or Environmental Statutes or Laws.........................68

12.2  Deemed Consent. ....................................................................68

**ARTICLE XIII.** CONDITIONS PRECEDENT ......................................................68

13.1  Conditions to Confirmation. ..................................................68

13.2    Conditions to Effective Date. .................................................................... 69

13.3    Waiver of Conditions. ............................................................................... 69

13.4    Effect of Failure of Conditions. ................................................................ 69

**ARTICLE XIV.** RETENTION OF JURISDICTION ..................................................... 70

14.1    Retention of Jurisdiction by the Bankruptcy Court. .............................. 70

**ARTICLE XV.** MISCELLANEOUS PROVISIONS ....................................................... 71

15.1    Modification and Amendments................................................................. 71

15.2    Revocation, Withdrawal or Non-Consummation. .................................. 71

15.3    Binding Effect: Successors and Assigns................................................. 71

15.4    Exclusivity. ............................................................................................... 71

15.5    Notices. ...................................................................................................... 72

15.6    Severability of Plan Provisions................................................................ 72

15.7    Governing Law; Construction.................................................................. 73

15.8    Notice of Effective Date. .......................................................................... 73

Wolf Creek Properties, LC, debtor-in-possession (the "Debtor") in the above-entitled case, and the Official Committee of the Unsecured Creditors of Wolf Creek Properties, LC (the "Committee" or the "Unsecured Creditors Committee") jointly propose the following First Amended Chapter 11 Plan pursuant to Section 1121(a) of the Bankruptcy Code:

## ARTICLE I.

## DEFINITIONS AND INTERPRETATION

### A.    DEFINITIONS.

The following terms used herein shall have the respective meanings defined below (such meanings to be equally applicable to both the singular and plural):

1.1    ***"Administrative Expense Claim"*** means any Claim constituting a cost or expense of administration of the Chapter 11 Case allowed under Section 503(b) of the Bankruptcy Code (including Sections 503(b)(9)), 507 (a)(2), and 507(b) of the Bankruptcy Code), including, without limitation, any actual and necessary costs and expenses of preserving the Debtor's estate, any actual and necessary costs and expenses of operating the Debtor's business, any actual and necessary costs and expenses of the administration and implementation of the Plan, any indebtedness or obligations incurred or assumed by the Debtor, as Debtor in Possession, during the Chapter 11 Case, including, without limitation, for the acquisition or lease of property or an interest in property or the rendition of services, any allowances of compensation and reimbursement of expenses to the extent allowed by Final Order under Sections 330 or 503 of the Bankruptcy Code, and any fees or charges assessed against the Debtor's Estate under Section 1930 of Chapter 123 of Title 28 of the United States Code.

1.2    ***"Administrative Expense Claim Bar Date"*** means the deadline for filing proofs of or requests for payment of Administrative Expense Claims, which shall be 60 days after the Effective Date, unless otherwise ordered by the Bankruptcy Court.

1.3    ***"Administrative Expense Claim Objection Deadline"*** means, as applicable, (a) the day that is the later of (i) the first Business Day that is at least 30 days after the Administrative Expense Claims Bar Date and (ii) as to Administrative Expense Claims filed after the Administrative Expense Claims Bar Date, the first Business Day that is at least 30 days after a Final Order is entered deeming the late filed claim to be treated as timely filed or (b) such later date as may be established by the Bankruptcy Court upon request of the Reorganized Debtor without further notice to parties-in-interest.

1.4    ***"Adversary Proceeding"*** means Adversary Proceeding No. 11-02381, filed with the Bankruptcy Court on April 14, 2011, and styled Fairways at Wolf Creek, LLC & Eden Village, LLC v. Wolf Creek Properties, L.C.

1.5    ***"Allowed" or "Allowed Claim"*** means that, with respect to a Claim, (i) such Claim has been listed by the Debtor in the Schedules, as such Schedules have been amended by the Amended Schedules or any other amendments by the Debtor from time to time,

in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and no contrary proof of claim has been filed, (ii) a proof of claim with respect to such Claim has been timely filed and no objection thereto has been interposed within the time period set forth in this Plan or such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or an objection thereto has been interposed and such Claim has been allowed in whole or in part by a Final Order, (iii) such Claim has been expressly allowed by a Final Order or under the Plan, or (iv) such Claim has been compromised, settled, or otherwise resolved pursuant to any authority granted to the Debtor prior to the Confirmation Date pursuant to a Final Order of the Bankruptcy Court, or such Claim has been compromised, settled, or otherwise resolved pursuant to any authority granted to the Reorganized Debtor Subcommittee after the Confirmation Date pursuant to a Final Order of the Bankruptcy Court or under the provisions of this Plan; provided, however, that Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" under the Plan.

1.6    *"Allowed Investments"* means only the following investments: demand and time deposits, such as short-term certificates of deposit in banks or other savings institutions rated AA or better by Moody's or Standard & Poor's or other high quality temporary liquid investments, such as United States Treasury Bills or Notes.

1.7    *"America First"* means Creditor America First Federal Credit Union, and its successors and assigns.

1.8    *"America First Collateral"* means the Collateral securing the Class 3 Claim of Creditor America First, consisting of the fixtures identified in the America First Proof of Claim as well as the following real estate Parcels:  Weber County Parcel Nos. 22-023-0086, 22-006-0019, 22-006-0004, 22-023-0019, 22-023-0020, 22-023-0045, 22-029-0008, 22-029-0010, and 22-023-0060.

1.9    *"America First Collateral Value"* means the value as of the Effective Date of the America First Collateral securing the Class 3 Claim of Creditor America First, as more fully described in Section 4.3.

1.10    *"America First Reserve Price"* means the reserve price set by America First for the America First Collateral in connection with the Estate Auction of the America First Collateral.

1.11    *"Avoidance Actions"* means any actions commenced, or that may be commenced before or after the Effective Date, pursuant to Sections 544, 547, 548, 549, or 550 of the Bankruptcy Code.

1.12    *"Bankruptcy Code"* or *"Code"* means Title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Case.

1.13    ***"Bankruptcy Court"*** or ***"Court"*** means the United States Bankruptcy Court for the District of Utah or such other court that exercises jurisdiction over the Chapter 11 Case.

1.14    ***"Bankruptcy Rules"*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under Section 2075 of Title 28 of the United States Code, as amended from time to time, and any Local Rules of the Bankruptcy Court, as applicable to the Chapter 11 Case.

1.15    ***"Bond"*** means the Disbursing Agent's Bond as outlined in Section 7.2(j) below.

1.16    ***"Business Day"*** means any day other than a Saturday, a Sunday, or any holiday recognized by the Bankruptcy Court.

1.17    ***"Budget"*** means the operating budget for the Estate taking effect as of the Effective Date.  The Debtor and the Committee shall submit a Budget as one of the Plan Agreements prior to the Exhibit Filing Date, and such Budget will be an Exhibit to this Plan.

1.18    ***"Capon Capital"*** means Creditor Capon Capital, LLC, and its successors and assigns.

1.19    ***"Capon Capital Collateral"*** means the Collateral securing the Class 6 Claim of Creditor Capon Capital, consisting of the personal property identified in the Capon Capital Proof of Claim as well as the following real estate Parcels:  Weber County Parcel Nos. 22-016-0064, 22-281-0001.  The mechanic's lien Class 8 Claim of Creditor Marriott Construction is secured by Weber County Parcel Nos. 22-016-0064, which is part of the Capon Capital Collateral.

1.20    ***"Capon Capital Collateral Value"*** means the value as of the Effective Date of the Capon Capital Collateral securing the Class 6 Claim of Creditor Capon Capital.

1.21    ***"Cash"*** means legal tender of the United States of America.

1.22    ***"Causes of Action"*** means any and all Claims, Avoidance Actions, and rights of the Debtor or the Estate, including Claims of the Debtor against any of its affiliates.

1.23    ***"Case"*** or ***"Chapter 11 Case"*** means this Chapter 11 case, styled "In re Wolf Creek Properties, LC" under case number 10-27816 in the United States Bankruptcy Court, District of Utah.

1.24    ***"Claim"*** shall have the meaning ascribed in Section 101 of the Bankruptcy Code.

1.25    ***"Class"*** means any group of Claims or Equity Interests classified by the Plan as set forth in Article III of the Plan.

1.26    ***"Collateral"*** means any property or interest in property of the Debtor's Estate subject to a Lien, charge, or other encumbrance to secure the payment or performance of a Claim, which Lien, charge, or other encumbrance is not subject to avoidance under the Bankruptcy Code.

1.27    ***"Committee" or "Unsecured Creditors Committee"*** means the Official Committee of Unsecured Creditors appointed by the Office of the United States Trustee in the Case, as constituted prior to and on the Effective Date.  All references to the Committee or the Unsecured Creditors Committee herein include the duly-appointed members of the Committee.

1.28    ***"Committee Accountants"*** means Berkeley Research Group, or its successors.

1.29    ***"Committee Counsel"*** means Ray Quinney & Nebeker P.C., or its successors.

1.30    ***"Confirmation"*** means the entry of the Confirmation Order.

1.31    ***"Confirmation Date"*** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court with respect to the Case.

1.32    ***"Confirmation Hearing"*** means the hearing to be held by the Bankruptcy Court regarding confirmation of the Plan in accordance with Section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

1.33    ***"Confirmation Order"*** means the order of the Bankruptcy Court confirming the Plan pursuant to Section 1129 of the Bankruptcy Code.

1.34    ***"Contingent Claim"*** means any Claim, the liability for which attaches or is dependent upon the occurrence of, or is triggered by, an event, which event has not yet occurred as of the date on which such Claim is sought to be estimated or an objection to such Claim is filed, whether or not such event is within the actual or presumed contemplation of the holder of such Claim and whether or not a relationship between the holder of such Claim and the Debtor now or hereafter exists or previously existed.

1.35    ***"Creditor"*** means any Entity holding a Claim against the Debtor's Estate or, pursuant to Section 102(2) of the Bankruptcy Code, against property of the Debtor, that arose or is deemed to have arisen prior to or as of the Petition Date.

1.36    ***"Debtor"*** means Wolf Creek Properties, LC, a Utah limited liability company.

1.37    ***"Debtor in Possession"*** means the Debtor in its capacity as a debtor in possession in the Case pursuant to Sections 1101, 1107(a), and 1108 of the Bankruptcy Code.

1.38   ***"Disbursing Agent"*** means Duane Gillman or any other individual who is acceptable to the Office of the U.S. Trustee, who shall be responsible for holding the funds of the Reorganized Debtor and making Distributions pursuant to this Plan as requested by the Reorganized Debtor Subcommittee.

1.39   ***"Disclosure Statement"*** means the Disclosure Statement with respect to the Plan filed with and approved by the Bankruptcy Court in accordance with Section 1125 of the Bankruptcy Code, as such Disclosure Statement may be amended, modified or supplemented.

1.40   ***"Disclosure Statement Order"*** means the order of the Bankruptcy Court approving the Disclosure Statement and establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan.

1.41   ***"Disputed Claim"*** means any Claim (including any Administrative Expense Claim) against the Debtor, proof of which was timely and properly filed, that is disputed under the Plan or as to which the Debtor or the Committee or the Reorganized Debtor Subcommittee or any other party in interest in the Case has interposed a timely objection and/or request for estimation in accordance with Section 502(c) of the Bankruptcy Code and Bankruptcy Rule 3018, which objection and/or request for estimation has not been withdrawn or determined by a Final Order, and any Claim, proof of which was required to be filed by order of the Bankruptcy Court, but as to which a proof of claim was not timely or properly filed.

1.42   ***"Disputed Claims Reserve"*** has the meaning set forth in Section 9.3 of this Plan.

1.43   ***"Disputed Claims Reserve Account"*** means a deposit account, interest bearing if possible, opened by the Disbursing Agent at the request of the Reorganized Debtor Subcommittee at an F.D.I.C. insured depository institution into which shall be deposited Cash representing "Unclaimed Property" (as that term is defined in Section 9.3 below) and Cash sufficient to fund the "Disputed Claims Reserve" (as defined in Section 9.3 below).

1.44   ***"Distributions"*** means the Cash to be distributed under this Plan by the Disbursing Agent to holders of Allowed Claims.

1.45   ***"Effective Date"*** means the first Business Day after the Confirmation Date, on which (i) no stay of the Confirmation Order is in effect, and (ii) the conditions precedent to the effectiveness of the Plan have been satisfied or waived by the parties entitled to the benefit of those conditions as set forth in this Plan.

1.46   ***"Employee Benefit Programs"*** means all health, dental, flexible medical payment, pension, welfare and retirement plans, and life and disability insurance policies, established by the Debtor for the benefit of its employees, if any, whether or not such plans or programs were or had been terminated according to their terms before or after the Petition Date or during the Case.

1.47   ***"Entity"*** means a Person, a corporation, a general partnership, a limited partnership, a limited liability company, a limited liability partnership, an association, a joint

stock company, a joint venture, an estate, a trust, an unincorporated organization, a governmental unit or any-subdivision thereof, including, without limitation, the U.S. Trustee.

1.48    ***"Equity Interest"*** means the membership rights of the equity holders in the Debtor.

1.49    ***"Estate"*** means the estate created in the Case on the Petition Date pursuant to Section 541 of the Bankruptcy Code, and all property of the Debtor and the Reorganized Debtor acquired before or after the Petition Date, until the Case is closed.

1.50    ***"Estate Auction***" means the sale at auction on Friday, June 1, 2012, or as soon thereafter as can be reasonably scheduled by the Reorganized Debtor Subcommittee, of all of the Debtor's real property (other than the Capon Capital Collateral, which will be disposed of as outlined in Sections 4.6 and 4.8 below) that has not been abandoned to any Secured Creditor that has elected Option A in the Plan treatment for such Secured Creditor (if this Plan provides Option A and Option B treatment for such Secured Creditor), as well as the sale at such auction of the following personal property of the Debtor identified in the Debtor's Schedules that is associated with the operations of the Debtor's ski resort and golf course:  all office equipment, furnishings, and supplies, all machinery, fixtures, equipment, and supplies used in business (including the Yamaha Golf Carts), all inventory, all household goods and furnishings, including audio, video, and computer equipment, all automobiles, trucks, trailers, and other vehicles and accessories (but expressly excluding the Ford Credit Collateral), and the Water Supply Agreements.

1.51    ***"Estate Auctioneer"*** means the auctioneer for the Estate Auction that is appointed by the Bankruptcy Court.

1.52    ***"Estate Auction Holdbacks"*** means the following holdbacks from the Gross Proceeds realized from the sale of the real or personal property of the Estate that is sold at the Estate Auction:  (a) a holdback equal to the expenses incurred in order to close the sale of any such real or personal property of the Estate, including payment of fees and/or commissions for the Estate Auctioneer and/or other independent sales brokers (not to exceed 6% of the Gross Proceeds) and payment of normal and customary closing costs and title insurance premiums and fees and costs; (b) a holdback equal to the amount of the U.S. Trustee's Distribution Fee that will be payable to the U.S. Trustee as a result of the distribution to each Secured Creditor of its share of the proceeds of the Estate Auction; (c) a holdback equal to the amount of all of the Weber County Secured Claims for each Parcel of the Estate's real property that is sold at the Estate Auction, which holdback will be used by the Disbursing Agent at the request of the Reorganized Debtor Subcommittee to immediately pay all of the Weber County Secured Claims against such Parcel; and (d) a holdback of five percent (5%) of the amount of the Gross Proceeds (which 5% holdback will be deemed to be different and distinct from a Section 506(c) Claim).  The holdback funds that are not paid directly at closing to a payee (such as the payment of closing costs and Weber County Secured Claims) will be deposited with the Disbursing Agent, who will dispose of the holdback funds as requested by the Reorganized Debtor Subcommittee.  The funds from the 5% holdback shall constitute a fund from which the costs and expenses of the liquidation of the Estate Assets shall be paid by the Disbursing Agent at the request of the

Reorganized Debtor Subcommittee, including the fees and payment of compensation for all attorneys, accountants, financial advisors and other professionals of the Debtor and the Reorganized Debtor Subcommittee, as well as all of the other expenses of the Estate relating to the marketing and sale of the real and personal property of the Estate, including payment of all necessary costs and expenses incurred by the Reorganized Debtor to preserve, protect and insure the Estate's assets pending the Estate Auction, and also including the fees, costs and expenses incurred by the Disbursing Agent.  The balance of the funds from the five percent (5%) holdback fund, if any, shall be distributed by the Disbursing Agent at the request of the Reorganized Debtor Subcommittee on a Pro Rata basis to those Secured Creditors who did not already receive the full amount of their Allowed Secured Claims and who are deemed to have contributed to the fund from the sale of their Collateral, with the Pro Rata distribution being based upon the proportion that the holdback from each sale of such Secured Creditor's Collateral contributed to the entire fund.

1.53     *"Estimated Amount"* means, with respect to any Disputed Claim, or group of Disputed Claims, the amount of such Claim or Claims, as estimated under Section 9.2 hereof.

1.54     *"Exhibit Filing Date"* means the date which is five (5) calendar days prior to the scheduled commencement of the Confirmation Hearing; provided, however, that the Debtor and the Committee reserve the right to file amended or revised versions of any exhibit or Plan Agreement through and including the Confirmation Date.  Any material modifications to the exhibits or the Plan Agreements shall be made on such notice as may be approved by the Bankruptcy Court.

1.55     *"Farm Bureau"* means Creditor Farm Bureau Life Insurance Company of Michigan, and its successors and assigns.

1.56     *"Farm Bureau Collateral"* means the Collateral securing the Class 4 Claim of Creditor Farm Bureau, consisting of the personal property listed in the UCC-1 Financing Statement in favor of the Farm Bureau filed on June 12, 2007 as File No. 321778200707 as well as the following real estate Parcel:  Weber County Parcel No. 22-016-0058.

1.57     *"Farm Bureau Collateral Value"* means the value as of the Effective Date of the Farm Bureau Collateral securing the Class 4 Claim of Creditor Farm Bureau, as more fully described in Section 4.4.

1.58     *"Farm Bureau Reserve Price"* means the reserve price set by the Farm Bureau for the Farm Bureau Collateral in connection with the Estate Auction of the Farm Bureau Collateral.

1.59     *"Final Order"* means an order or judgment of the Bankruptcy Court entered by the clerk of the Bankruptcy Court on the docket in the Chapter 11 Case, that has not been reversed, vacated, or stayed, and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired, and as to which no appeal, petition

for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument, or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order shall not cause such order to not be a Final Order.

1.60    *"Ford Credit"* means Creditor Ford Credit, and its successors and assigns.

1.61    *"Ford Credit Collateral"* means the Collateral securing the Class 11 Claim of Creditor Ford Credit, consisting of the Debtor's Ford 350 pickup truck and the Debtor's Ford Econoline.

1.62    *"Ford Credit Collateral Value"* means the value as of the Effective Date of the Ford Credit Collateral securing the Class 11 Claim of Creditor Ford Credit, as more fully described in Section 4.11.

1.63    *"General Unsecured Claim"* means any Claim against the Debtor other than an Administrative Expense, a Secured Claim, a Priority Tax Claim, a Priority Claim, an Equity Interest or a Post-Effective Date Claim.

1.64    *"Gross Proceeds"* means all Cash or other proceeds realized from the sale or other disposition of any real or personal property of the Estate, whether tangible or intangible, including the sale of the Estate assets at the Estate Auction sale, and all interest, rents, profits and proceeds of, or earned on account of, assets of the Estate.

1.65    *"Impaired"* when used with respect to any Claims, Interest or Class, shall have the meaning set forth in 11 U.S.C. §1124.

1.66    *"Interpleader Proceeding"* means an adversary proceeding filed by the Reorganized Debtor Subcommittee with the Bankruptcy Court for the purpose of interpleading the Estate Auction proceeds, if it becomes necessary for the Reorganized Debtor Subcommittee to file the Interpleader Proceeding.  The Secured Creditors with claims to the Estate Auction proceeds will be named as interpleader defendants to the Interpleader Proceeding.

1.67    *"IRS"* means the Internal Revenue Service, an agency of the United States Department of Treasury.

1.68    *"Lien"* means any charge against or interest in property to secure payment of a debt or performance of an obligation.

1.69    *"Marriott Construction"* means mechanic's Lien Creditor Randy Marriott Construction, and its successors and assigns.

1.70    ***"Marriott Construction Collateral Value"*** means the value as of the Effective Date of the Marriott Construction Collateral securing the Class 8 Claim of Creditor Marriott Construction.

1.71    ***"Nominee"*** shall mean a receiver or escrow company or Affiliate of a Secured Creditor or any other entity designated by a Secured Creditor to be the grantee of any Quitclaim Deed transferring title to the Secured Creditor's Collateral.  If a Secured Creditor requests that a Nominee be the grantee of the Quitclaim Deed for such Secured Creditor's Collateral, such Secured Creditor will not be entitled to add the costs and expenses of such Nominee to any deficiency claim asserted by such Secured Creditor (if any).

1.72    ***"Non-Tax Priority Claim"*** means any Priority Claim that is not a Priority Tax Claim.

1.73    ***"Parcel" or "Parcels"*** shall mean individually or collectively any of the parcels of real property owned by the Debtor as of the Petition Date, as identified in the Original Schedules or otherwise.

1.74    ***"Parcel No. 0001"*** shall mean Weber County Parcel No. 22-181-0001, which is part of the Capon Capital Collateral, and which is encumbered by the Class 6 trust deed lien of Creditor Capon Capital.

1.75    ***"Parcel No. 0064"*** shall mean Weber County Parcel No. 22-016-0064, which is part of the Capon Capital Collateral, and which is encumbered by the Class 6 trust deed lien of Creditor Capon Capital and the mechanic's lien Class 8 Claim of Creditor Marriott Construction.

1.76    ***"Person"*** shall have the meaning set forth in Section 101(41) of the Bankruptcy Code.

1.77    ***"Petition Date"*** means June 9, 2010, the date on which the Debtor filed its voluntary petition under Chapter 11 of the Bankruptcy Code.

1.78    ***"Plan"*** means this Second Amended Plan of Reorganization, as the same may be amended or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms of the Plan.

1.79    ***"Plan Agreement"*** means any written contract, instrument, release indenture, or other document or agreement (a) incorporated into the Plan, (b) designated as an exhibit to the Plan, or (c) entered into in connection with the Plan, which expressly states that it is intended to be a Plan Agreement.  The Plan Agreements, or drafts thereof, shall be filed on the Exhibit Filing Date.  Plan Agreements which consist of contractual agreements among the signatories thereto shall not be amended or revised except as provided therefore in such agreements.

1.80    ***"Plan Disbursement Account"*** means a deposit account opened by the Disbursing Agent at the request of the Reorganized Debtor Subcommittee at an F.D.I.C. insured

depository institution, interest-bearing if possible, into which shall be deposited Cash for Distribution by the Disbursing Agent at the request of the Reorganized Debtor Subcommittee to holders of Allowed Administrative Expenses and Allowed Claims under Section 9.2 below.

      1.81    *"Plan Interest Rate"* means five and one half percent (5 ½%) per annum.

      1.82    *"Post-Effective Date Claims"* means (a) the actual and necessary fees and expenses accrued on or after the Effective Date with respect to independent contractors, and professionals engaged by the Reorganized Debtor Subcommittee to administer the Estate and conclude the Case, (b) the actual and necessary out-of-pocket expenses of the Reorganized Debtor Subcommittee, (c) any sales taxes, income taxes, franchise taxes or fees, or license fees attributable to the Estate and accrued on or after the Effective Date, (d) all fees which accrue after the Effective Date which are payable pursuant to Section 2.3 hereof to the U.S. Trustee under 28 U.S.C. Section 1930(a)(6), and (e) all operating expenses and costs included in the Budget.

      1.83    *"Priority Claim"* means any Claim to the extent entitled to priority in payment under Sections 507(a)(3), (4) and (6) of the Bankruptcy Code.

      1.84    *"Priority Dispute Resolution"* shall have the meaning outlined in Section 4.6.

      1.85    *"Priority Tax Claim"* means any Claim of a governmental unit of the kind entitled to priority in payment as specified in Sections 502(i) and 507(a)(8) of the Bankruptcy Code.

      1.86    *"Pro Rata"* means proportionately so that the ratio of (a) the cumulative amount of all funds distributed or to be distributed on account of a particular Allowed Claim or Equity Interest to (b) the amount of such Allowed Claim or Equity Interest is the same as the ratio of (x) the cumulative amount of all funds distributed or to be distributed on account of all Allowed Claims or Equity Interests in a particular Class to (y) the amount of all Allowed Claims or Equity Interests of that Class.

      1.87    *"Quitclaim Deed"* means a deed from the Reorganized Debtor abandoning or conveying to a Secured Creditor or to the Nominee of the Secured Creditor the Collateral of such Secured Creditor.  The grantee of a Quitclaim Deed for any particular Secured Creditor's Collateral shall be the Secured Creditor or a Nominee of the Secured Creditor, as directed by the Secured Creditor.

      1.88    *"Reorganized Debtor"* means the Debtor, as reorganized as of the Effective Date in accordance with the Plan, and thereafter.

      1.89    *"Reorganized Debtor Board of Managers"* means the reconstituted seven member Board of Managers for the Reorganized Debtor that will be effective on the Effective Date, consistent with the provisions of Section 8.1 below.

1.90    ***"Reorganized Debtor Subcommittee"*** means the five member
Subcommittee of the Reorganized Debtor Board of Managers that will be created and become
effective on the Effective Date as described in Section 8.1 below.  The Reorganized Debtor
Subcommittee (instead of the Reorganized Debtor Board of Managers) shall be the
representative of the Debtor on behalf of the Reorganized Debtor and shall conduct the
liquidation of the Reorganized Debtor's Estate after the Effective Date, and request that the
Disbursing Agent make all Distributions contemplated by this Plan, consistent with the
provisions of Article VIII below and all other provisions of this Plan.

1.91    ***"Reorganized Debtor Subcommittee Agents"*** shall have the meaning
outlined in Section 8.6 of this Plan.

1.92    ***"Reorganized Debtor Subcommittee Members"*** means the five members
of the Reorganized Debtor Subcommittee from time to time, which five members and their
representatives and alternate representatives (and their successors, if any) shall be appointed
consistent with the terms of Section 8.1 of this Plan.

1.93    ***"Reserve Account"*** means a deposit account, opened by the Disbursing
Agent at the request of the Reorganized Debtor Subcommittee at an F.D.I.C insured depository
institution, interest-bearing if possible, into which shall be deposited Cash sufficient to fund the
Budget.

1.94    ***"Reserve Price"*** means the reserve price set by the Reorganized Debtor
Subcommittee for the Unencumbered Assets in connection with the Estate Auction of the
Unencumbered Assets or a reserve price set by one of the following Secured Creditors in
connection with the Estate Auction of such Secured Creditor's Collateral:  (a) America First; (b)
the Farm Bureau; (c) Zions Bank; and (d) the Wolf Creek Investors.

1.95    ***"Retained Claims and Defenses"*** means any and all claims, causes of
action, and defenses, including: counterclaims, rights of offset or recoupment; objections to
Claims; objections to the validity, priority, amount, allowance, or classification of any Claim;
rights to seek equitable or contractual subordination of Claims; rights relating to the
determination of the Allowed amounts for Secured Claims and recovery rights with respect to the
preservation and disposition of Estate assets that are Collateral for Secured Creditors (including
but not limited to all Section 506(c) Claims and all other rights arising under Bankruptcy Code
Section 506); and avoidance and recovery of prepetition or postpetition transfers (including but
not limited to those arising under Bankruptcy Code Sections 542, 543, 544, 545, 546, 547, 548,
549, 550, 551 and 553), which claims, causes of action, and defenses are against, arise out of, or
are related to any of the following:

(a)    All claims, causes of action and defenses against the current and/or past
officers and/or members or managers of the Debtor, including claims, causes of action and
defenses arising out of or related to breach of duty, negligence, mismanagement and/or excessive
compensation;

(b)     All claims, causes of action and defenses against former advisors, including, without limitation, objections to or actions to avoid or subordinate any Claims arising from notes, debentures, fee deferral agreements, or other contracts or relationships with respect to such Persons, arising out of or related to services rendered by such investment advisors, or any of them;

(c)     All defenses, counterclaims, third party claims, offset claims, rights of recoupment, causes of action for equitable or contractual subordination, indemnity claims and coverage claims arising out of or related to any Claim against the Debtor, whether based on the Bankruptcy Code or any applicable law;

(d)     All claims, causes of action and defenses against or with respect to financial institutions and any other Person for the turnover of funds of, or due to, the Estate;

(e)     All rights, causes of action, defenses, claims, powers, privileges and licenses of the Estate and the Debtor;

(f)     All causes of action, claims and defenses arising under the Plan, the Plan Agreements and the Bankruptcy Code;

(g)     All rights, claims, causes of action and defenses for coverage in or under any and all insurance policies of the Debtor;

(h)     All claims, causes of action, and defenses arising under or related to any product warranty, service warranty, or representation of merchantability issued by or in favor of Debtor; and

(i)     All claims, causes of action, and defenses arising under or related to the Adversary Proceeding.

1.96    **"Roberts Group"** means collectively Creditors Suzanne Roberts, SCR Investments, Inc., the Estate of Steven Roberts, and the Roberts Living Trust, as outlined in Section 4.13.

1.97    **"Schedules"** means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtor pursuant to section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements may be supplemented or amended on or prior to the Effective Date.  **"Original Schedules"** means the Debtor's original Schedules filed on June 30, 2010 as Docket No. 32.  **"Amended Schedules"** means the Debtor's amended Schedules filed on October 21, 2010 as Docket No. 121.

1.98    **"Section 506(c) Claim"** means any claim asserted by the Reorganized Debtor Subcommittee against a Secured Creditor under Section 506(c) of the Bankruptcy Code to recover for the benefit of the Estate funds that have been incurred by the Debtor during the course of the Chapter 11 Case or by the Reorganized Debtor Subcommittee after the Effective

Date for the preservation and disposition of the Estate assets that are Collateral for such Secured Creditor.

1.99    ***"Secured Claim"*** means a Claim against the Debtor (a) secured by a valid, perfected, and unavoidable Lien on Collateral or (b) subject to setoff under Sections 553, 555, 556, 559, 560, and 561 of the Bankruptcy Code, in each case to the extent of the value of the Collateral or to the extent of the amount subject to setoff, as applicable, as determined in accordance with Section 506(a) of the Bankruptcy Code or as otherwise agreed to, in writing, by the Debtor and the Committee (prior to the Effective Date) or by Reorganized Debtor Committee (after the Effective Date), as the case may be, and the holder of such Claim; provided, however, that, to the extent that the value of such interest is less than the amount of the Claim which has the benefit of such security, the unsecured portion of such Claim shall be treated as an Unsecured Claim unless, in any such case, the Class of which such Claim is a part makes a valid and timely election in accordance with Section 1111(b) of the Bankruptcy Code to have such Claim treated as a Secured Claim to the extent allowed.

1.100    ***"Secured Creditor"*** means a Creditor that holds a Secured Claim.

1.101    ***"Secured Tax Claim"*** means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under Section 507(a)(8) of the Bankruptcy Code.

1.102    ***"Unclaimed Property"*** has the meaning set forth in Section 9.3 below.

1.103    ***"Unencumbered Assets"*** has the meaning set forth in Section 4.3(b)(3)(B) below.

1.104    ***"Unliquidated Claim"*** means any Claim, the amount of liability for which has not been fixed, whether pursuant to agreement, applicable law, or otherwise, as of the date on which such Claim is sought to be estimated.

1.105    ***"Unsecured Claim"*** means a Claim that is not a Secured Claim.

1.106    ***"Unsecured Creditor"*** means a Creditor that holds an Unsecured Claim.

1.107    ***"U.S. Trustee"*** means the United States Trustee appointed under Section 581 of Title 28 of the United States Code to serve in the District of Utah.

1.108    ***"U.S. Trustee's Distribution Fee"*** means the fee that will be due to the U.S. Trustee on the amount of money that will be distributed to the Secured Creditors as a result of the sale of their Collateral at the Estate Auction.

1.109    ***"Water Assets Sale"*** means the Bankruptcy Court approved sale of certain water assets of the Debtor and the Debtor's sub-subsidiaries, which was approved by Bankruptcy Court Order entered on January 21, 2011 as Docket No. 182.

1.110  ***"Water Supply Agreements"*** means the Water Supply Agreements between the Debtor and Wolf Creek Water and Sewer Improvement District entered into in January of 2011 in connection with the Water Assets Sale as referenced in the Bankruptcy Court Order entered on January 21, 2011 as Docket No. 182.  Pursuant to the Water Supply Agreements, the Debtor has access to the necessary sources of water for the Debtor's golf course.  Zions Bank has an approved post-petition Lien on the Water Supply Agreements.

1.111  ***"Weber Conservancy District"*** means Creditor Weber Basin Water Conservancy District, and its successors and assigns.

1.112  ***"Weber Conservancy District Collateral"*** means the Collateral securing the Class 10 Claim of Creditor Weber Conservancy District, consisting of the following Parcel: Weber County Parcel No. 22-020-0007.

1.113  ***"Weber County"*** means Creditor Weber County, Utah.

1.114  ***"Weber County Collateral"*** means each of the Parcels of the Debtor on which there are unpaid real property taxes, and which secure each of the Weber County Secured Claims.

1.115  ***"Wolf Creek Investors"*** means Creditor Wolf Creek First Mortgage Investors, L.P., and its successors and assigns.

1.116  ***"Wolf Creek Investors Collateral"*** means the Collateral securing the Class 7 Claim of Creditor Wolf Creek Investors, consisting of the following real estate Parcels: Weber County Parcel Nos. 22-016-0017 and 22-287-0001.

1.117  ***"Wolf Creek Investors Collateral Value"*** means the value as of the Effective Date of the Wolf Creek Investors Collateral securing the Class 7 Claim of Creditor Wolf Creek Investors, as more fully described in Section 4.7.

1.118  ***"Wolf Creek Investors Reserve Price"*** means the reserve price set by the Wolf Creek Investors for the Wolf Creek Investors Collateral in connection with the Estate Auction of the Wolf Creek Investors Collateral.

1.119  ***"Yamaha"*** means Creditor Yamaha Motor Corporation USA, and its successors and assigns.

1.120  ***"Yamaha Golf Carts"*** means the golf carts which the Debtor is leasing from Creditor Yamaha.

1.121  ***"Zions Bank"*** means Creditor Zions First National Bank, and its successors and assigns.

1.122  ***"Zions Bank Collateral"*** means the Collateral securing the Class 5 Claim of Creditor Zions Bank, consisting of Zions Bank's post-petition Lien on the Water Supply Agreements as well as the following real estate Parcels:  Weber County Parcel Nos. 22-016-

0065, 22-016-0025, 22-016-0066, 22-016-0062, 22-017-0006, 22-017-0007, 22-017-0009, 22-017-0011, 22-017-0015, 22-017-0016, 22-021-0126, and 22-016-0011.

1.123   ***"Zions Bank Collateral Value"*** means the value as of the Effective Date of the Zions Bank Collateral securing the Class 5 Claim of Creditor Zions Bank, as more fully described in Section 4.5.

1.124   ***"Zions Bank Reserve Price"*** means the reserve price set by Zions Bank for the Zions Bank Collateral in connection with the Estate Auction of the Zions Bank Collateral.

**B.     INTERPRETATION; APPLICATION OF DEFINITIONS AND RULES OF CONSTRUCTION.**

Unless otherwise specified, all section or exhibit references used in the Plan are to the respective section in, or exhibit to, the Plan, as the same may be amended, waived, or modified from time to time.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein. A term used herein that is not defined herein shall have the meaning ascribed to that term in the Bankruptcy Code. The rules of construction contained in Section 102 of the Bankruptcy Code shall apply to the Plan.  In the event that a particular term of the Plan (including any exhibits or schedules hereto) conflicts with a particular term of the definitive documentation required to be implemented pursuant to the terms of the Plan or any settlement or other agreement contemplated hereunder, the definitive documentation shall control and shall be binding on the parties thereto.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions of the Plan.

## ARTICLE II.

## TREATMENT OF UNCLASSIFIED CLAIMS

2.1   ***Administrative Expense Claims.***

(a)     <u>Time for Filing Administrative Expense Claims</u>.  The holder of an Administrative Expense Claim, other than (i) a liability incurred and payable in the ordinary course of business by the Debtor (and not past due), or (ii) an Administrative Expense Claim that has been Allowed on or before the Effective Date, must file with the Bankruptcy Court and serve on the Reorganized Debtor and the U.S. Trustee, notice of such Administrative Expense Claim on or prior to the Administrative Expense Claim Bar Date (i.e., 60 days after the Effective Date). Such notice must include at a minimum (A) the name of the holder of the Claim, (B) the amount of the Claim, and (C) the basis for the Claim, and must include any documentation supporting the Claim. **Failure to file and serve such notice timely and properly will result in the Administrative Expense Claim being forever barred and discharged.**

(b)     <u>Allowance of Administrative Expense Claims</u>.  An Administrative Expense Claim with respect to which notice has been properly filed and served pursuant to Section 2.1(a) hereof shall become an Allowed Administrative Expense Claim if no objection is

filed on or prior to the Administrative Expense Claim Objection Deadline. If an objection is timely filed, the Administrative Expense Claim shall become an Allowed Administrative Expense Claim only to the extent allowed by Final Order or as such Claim is settled, compromised, or otherwise resolved by the Reorganized Debtor.

(c)     Payment of Allowed-Administrative Expense Claims.  Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a less favorable treatment, each Allowed Administrative Expense Claim shall be paid by the Reorganized Debtor Subcommittee in full, in Cash, in an amount equal to the unpaid portion of such Allowed Administrative Expense Claim on or as soon as reasonably practicable following the later to occur of (a) the Effective Date or (b) the date on which such Administrative Expense Claim becomes an Allowed Claim; provided, however, that Allowed Administrative Expense Claims against the Debtor representing liabilities incurred in the ordinary course of business by the Debtor, as Debtor in Possession, or liabilities arising under loans or advances to or other obligations incurred by the Debtor, as Debtor in Possession, pursuant to Bankruptcy Court approval, shall be paid by the Reorganized Debtor Subcommittee in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

## 2.2   *Priority Tax Claims.*

(a)     Payment of Priority Tax Claims.  Except to the extent that a holder of an Allowed Priority Tax Claim has been paid by the Debtor prior to the Effective Date or agrees to a less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Reorganized Debtor, (a) cash in an amount equal to such Allowed Priority Tax Claim on the Effective Date, (b) in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code, equal semiannual cash payments in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at the applicable non-bankruptcy rate, commencing upon the Effective Date and continuing over a period ending not later than June 9, 2015 (five years after the date the Case was commenced), or (c) such other treatment as shall be determined by the Bankruptcy Court to provide the holder of such Allowed Priority Tax Claim deferred cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim.

## 2.3   *United States Trustee Quarterly Fees and Other Statutory Fees.*

(a)     Payment of U.S. Trustee Fees.  All fees due and payable under Section 1930 of Title 28 shall be paid within ten Business Days after the Effective Date. In addition, the Reorganized Debtor Subcommittee shall pay the U.S. Trustee quarterly fees due and payable on all disbursements, including Plan payments and disbursements, in and outside of the ordinary course of business until entry of a final decree, dismissal of the Case or conversion of the Case to a case under Chapter 7, as such obligations become due.

# ARTICLE III.

## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

3.1     *Classification.*

(a)     <u>Classification Rules</u>.  Claims for Administrative Expenses and Priority Tax Claims have not been classified and are excluded from the following classes in accordance with Section 1123(a)(1) of the Bankruptcy Code.  A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of the Class and is classified in a different Class to the extent that any remainder of the Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that the Claim or Equity Interest is an Allowed Claim or Allowed Equity Interest in that Class and has not been paid, released, or otherwise satisfied before the Effective Date.

(b)     <u>Classification Rules</u>.  Disputes regarding the proper classification of Claims not specifically classified herein shall be resolved pursuant to the procedures established by the Code and Bankruptcy Rules and other applicable law, the Bankruptcy Court, and this Plan.  Such resolution shall not be a condition precedent to Confirmation or consummation of this Plan.

(c)     <u>Table of Classes</u>.  The following table designates the Classes of Claims against and Equity Interests in the Debtor and specifies which of those Classes are (i) impaired or unimpaired by the Plan and (ii) entitled to vote to accept or reject the Plan in accordance with Section 1126 of the Bankruptcy Code or (iii) deemed to reject the Plan.

| CLASS | DESIGNATION | IMPAIRMENT | ENTITLED TO VOTE |
|---|---|---|---|
| 1 - Employee Claims | Employee Claims | Unimpaired | No |
| 2 – Non-Tax Priority Claims | Priority Claims | Unimpaired | No |
| 3 - Secured Claim of America First Credit Union | Secured Claim | Impaired | Yes |
| 4 - Secured Claim of the Farm Bureau | Secured Claim | Impaired | Yes |
| 5 - Secured Claim of Zions Bank | Secured Claim | Impaired | Yes |
| 6 - Secured Claim of Capon Capital | Secured Claim | Impaired | Yes |
| 7 - Secured Claim of Wolf Creek First Investors | Secured Claim | Impaired | Yes |

| 8 - Secured Claim of Randy Marriott | Secured Claim | Impaired | Yes |
|---|---|---|---|
| 9 - Secured Claims of Weber County | Secured Claims | Impaired | Yes |
| 10 - Secured Claim of Weber Basin Water Conservancy District | Secured Claim | Impaired | Yes |
| 11 - Secured Claim of Ford Credit | Secured Claim | Impaired | Yes |
| 12 - Claims of the Estate of Steven Roberts, SCR Investments, Inc., Robert Living Trust and Suzanne Roberts | Unsecured Claims | Impaired | Yes |
| 13 - General Unsecured Claims | Unsecured Claims | Impaired | Yes |
| 14 - Equity Interests | Interests in Debtor | Impaired | Yes |

## ARTICLE IV.

## TREATMENT OF CLAIMS AND EQUITY INTERESTS

### 4.1 *Class 1 – Employee Claims*

(a)    <u>Classification</u>.  Class 1 Claims consist of the Allowed Claims of Debtor's employees.

(b)    <u>Treatment</u>.  The Debtor believes that all Claims of this Class have been paid in full. To the extent of any unpaid Claims, each holder of an Allowed Employee Claim shall receive, on account of their Claims against the Debtor, cash in an amount equal to the Allowed Claim amount on the later of the Effective Date or the date such Employee Claim becomes an Allowed Claim, or as soon after as is practicable.

### 4.2 *Class 2 – Non-Tax Priority Claims*.

(a)    <u>Classification</u>.  Class 2 Claims consist of any Allowed Non-Tax Priority Claims under the Bankruptcy Code.

(b)    <u>Treatment</u>.  Unless other mutually agreed upon by the holder of an Allowed Non-Tax Priority Claim and the Reorganized Debtor Subcommittee, each holder of an Allowed Non-Tax Priority Claim shall receive, on account of their claims against the Debtor, cash from the Disbursing Agent at the request of the Reorganized Debtor Subcommittee in an amount equal to such Allowed Non-Tax Priority Claim on the later of the Effective Date or the

date such Non-Tax Priority Claim becomes an Allowed Non-Tax Priority Claim, or as soon thereafter as is practicable.

       4.3    ***Class 3 — Secured Claim of America First Federal Credit Union***

      (a)    <u>Classification.</u>  The Class 3 Claim consists of the Allowed Secured Claim of America First Federal Credit Union ("America First").

      (b)    <u>Treatment.</u>  America First, the holder of the Allowed Secured Claim of this Class, shall receive the following treatment:

      (1)    <u>Retention of Liens.</u>  Subject to the provisions outlined below, America First shall retain all prepetition Liens securing the Allowed Secured Claim of this Class having the same rights and priorities accorded to such Liens as of the Petition Date.  If America First elects Option B below, the Reorganized Debtor Subcommittee shall have the right to sell the America First Collateral free and clear of the America First Liens, with such Liens to attach to the Estate Auction proceeds as more fully outlined below.

      (2)    <u>Application of America First's Cash Collateral.</u>  The Cash Collateral from the Water Assets Sale being held for America First in the amount of $4,859.52 plus interest thereon shall be applied to the America First Claim on the Effective Date, thereby reducing the amount owed on the America First Allowed Secured Claim.

      (3)    <u>Optional Treatment:  Abandonment of America First Collateral With Right to Assert Deficiency Claim, or Estate Auction Sale by Estate Auctioneer with Reserve Price and With No Deficiency Claim.</u>  The holder of the Allowed Secured Claim of America First shall exercise in writing one of the following two options no later than 5:00 p.m. on the next Business Day following the completion of the Confirmation Hearing.  If America First fails to deliver to the Reorganized Debtor Subcommittee its written decision to exercise Option A or Option B as set forth below no later than 5:00 p.m. on the next Business Day following the completion of the Confirmation Hearing, America First shall be deemed to have irrevocably accepted Option B below.

      (A)  <u>Option A</u>:  Under this Option A only, the America First Secured Claim shall be Allowed in the amount of $10,740,554.48, the amount set forth in the America First Proof of Claim.  The America First Collateral shall be abandoned by the Reorganized Debtor  to America First as soon as practicable after America First has elected Option A, and this shall be accomplished by the Reorganized Debtor Subcommittee on behalf of the Reorganized Debtor delivering to America First or to America First's Nominee a Quitclaim Deed to the America First Collateral.  The Quitclaim Deed shall expressly state the following: (i) the America First Collateral is being conveyed to America First or to America First's Nominee subject to all existing Liens of record, including without limitation the Liens of Weber County and the Roberts Group on the America First Collateral, (ii) there shall be no merger of title between America First's Liens, which will remain in effect and are not terminated under this Plan, and ownership of the America First Collateral, and (iii) America First is entitled to foreclose its preserved Liens against the America First Collateral.

Within three months of the delivery of the Quitclaim Deed to America First or America First's Nominee, if America First claims that the America First Collateral Value is not equal to the amount of the America First Allowed Secured Claim and that America First is entitled to an unsecured deficiency claim, America First shall file an adversary proceeding in the Bankruptcy Court asserting the amount of its deficiency claim, and the Bankruptcy Court shall determine the amount of America First's deficiency claim by applying deficiency rules consistent with the deficiency rules in Utah Code Ann. Section 57-1-32 (including the provisions in that Section for the award of costs and reasonable attorney fees to the prevailing party) and other applicable Utah law for the assertion of a deficiency claim following a foreclosure sale. The amount of America First's deficiency claim as determined by a Final Order shall be an Allowed Unsecured Claim under Class 13. If America First does not file such adversary proceeding within the three months deadline, the America First Allowed Secured Claim shall be deemed to have been satisfied in full by the abandonment of the America First Collateral, and America First shall be barred from asserting any deficiency claim or any Allowed Unsecured Claim under Class 13. The Reorganized Debtor reserves its right to assert a Section 506(c) Claim against America First under this Option A.

(B)   Option B:   Under this Option B, the Reorganized Debtor will not assert any Section 506(c) Claim against America First unless America First exercises its credit bid rights below. The Estate Auctioneer will endeavor to sell the America First Collateral on behalf of the Reorganized Debtor at the Estate Auction, along with all other Estate assets to be sold at the Estate Auction. On or before 5:00 p.m. on the next Business Day following the completion of the Confirmation Hearing, America First shall notify the Reorganized Debtor Subcommittee in writing of the minimum reserve price (the "America First Reserve Price") for the America First Collateral to be sold at the Estate Auction. The America First Reserve Price cannot exceed the Allowed amount of $10,740,554.48 for the America First Claim set forth in Option A above. If America First does not designate the amount of the America First Reserve Price by this deadline, the Reorganized Debtor Subcommittee will set the Reserve Price for the America First Collateral at an amount equal to fifty percent (50%) of the Allowed amount for the America First Claim, but that Reserve Price will only apply to the first phase of the Estate Auction, and will not apply to the second phase of the Estate Auction.

The Reorganized Debtor Subcommittee will inform the Estate Auctioneer of the amount of the America First Reserve Price. The Reorganized Debtor Subcommittee shall also have the right to set a Reserve Price with the Estate Auctioneer for the unencumbered assets of the Debtor to be sold at the Estate Auction (the "Unencumbered Assets"). The potential bidders for the Estate Auction will be informed by the Estate Auctioneer in advance of the Estate Auction that Reserve Prices have been set for all of the Estate assets being sold at the Estate Auction, but the Estate Auctioneer will not disclose to the potential bidders the amounts of any of the Reserve Prices in advance of or at the Estate Auction.

The Estate Auctioneer will then conduct the Estate Auction through potentially two phases. The Estate Auctioneer will first attempt to auction all of the Debtor's assets being sold at the Estate Auction together as one combined unit for an amount that is in excess of the aggregate amount of all of the Reserve Prices for the America First Collateral,

the Farm Bureau Collateral, the Zions Bank Collateral, the Wolf Creek Investors Collateral, and the Unencumbered Assets.

If the first phase of the Estate Auction results in a successful sale for an amount equal to these aggregate Reserve Prices, then on or before June 15, 2012, the Disbursing Agent at the request of the Reorganized Debtor Subcommittee shall distribute to America First the amount of the America First Reserve Price minus America First's share of the Estate Auction Holdbacks, which distribution to America First will be in full satisfaction of the Class 3 Claim of America First, with no unsecured deficiency claim for America First. If the first phase of the Estate Auction results in a successful sale for an amount in excess of these aggregate Reserve Prices, then on or before June 15, 2012, the Disbursing Agent at the request of the Reorganized Debtor Subcommittee shall distribute to America First the amount of the America First Reserve Price minus America First's share of the Estate Auction Holdbacks, and the Reorganized Debtor Subcommittee will also propose at that time to all of the Secured Creditors whose Collateral was sold at the Estate Auction its proposed allocation of the excess proceeds among the various claimants to such excess proceeds, including any allocation attributable to the Unencumbered Assets. If the various claimants to such excess proceeds do not agree to the Reorganized Debtor Subcommittee's proposed allocation of such excess proceeds by July 13, 2012, the Reorganized Debtor will interplead such excess proceeds with the Bankruptcy Court by filing the Interpleader Proceeding, and the various claimants to the Estate Auction Proceeds will bear their own expenses in connection with the Interpleader Proceeding. The Bankruptcy Court will determine the final distributions of such excess proceeds from the Estate Auction among the various claimants (including the allocation to the Reorganized Debtor of any excess proceeds allocable to the Unencumbered Assets) by a Final Order entered in the Interpleader Proceeding.

America First shall have the right to participate in the bidding for the first phase of the Estate Auction; provided, however, that America First shall only have the right to make a combined credit bid and Cash bid for the entire asset package being sold at the Estate Auction, and America First shall not have the right to remove the America First Collateral from the Estate Auction or to credit bid only for the America First Collateral. If America First elects to participate in the bidding for the first phase of the Estate Auction, America First must identify separately the amount of its credit bid (which must be in the amount of the America First Reserve Price, and which will only be allocable to the America First Collateral, and will not be allocable to the purchase of any other property) as well as the amount of its Cash bid for the remainder of the Debtor's assets that are being sold at the Estate Auction (which must be payable in Cash). If America First is the successful bidder for the first phase of the Estate Auction, America First will be responsible to pay all of the closing costs and auction commissions and other expenses from the Estate Auction as well as America First's share of all other Estate Auction Holdbacks, and America First will also be responsible for any other Section 506(c) expenses that the Bankruptcy Court determines are allocable to America First.

If the Estate Auctioneer is unsuccessful in obtaining a price that is equal to or in excess of the aggregate Reserve Prices for the first phase of the Estate Auction, the Estate Auctioneer will immediately go to the second phase of the Estate Auction and attempt to auction the Debtor's assets as separate lots in the following order, with the collateral of each

Secured Creditor outlined below to be sold as a combined unit and subject to the Reserve Price (if any) established by such Secured Creditor for its collateral:  (1) the America First Collateral; (2) the Farm Bureau Collateral; (3) the Zions Bank Collateral; (4) the Wolf Creek Investors Collateral; and (5) the Unencumbered Assets.  If two or more of the Secured Creditors agree that their Collateral should be sold together as one unit, rather than separate units, they shall inform the Estate Auctioneer of their agreement at the beginning of the second phase of the Estate Auction.  If the Estate Auctioneer does not receive a bid for the Unencumbered Assets during the second phase of the Estate Auction for the Reserve Price set by the Reorganized Debtor Subcommittee, then the Reorganized Debtor Subcommittee will be authorized to proceed to liquidate the Unencumbered Assets by any other method selected by the Reorganized Debtor Subcommittee and for a price determined by the Reorganized Debtor Subcommittee, with the proceeds to be deposited with the Disbursing Agent.

     If the second phase of the Estate Auction results in a successful sale of the America First Collateral for an amount equal to or greater than the America First Release Price that was set by America First by the deadline outlined above, then on or before June 15, 2012, the Disbursing Agent at the request of the Reorganized Debtor Subcommittee shall distribute to America First the amount bid for the America First Collateral at the second phase of the Estate Auction minus America First's share of the Estate Auction Holdbacks, which distribution to America First will be in full satisfaction of the Class 3 Claim of America First, with no unsecured deficiency claim for America First.  If America First does not designate the America First Reserve Price by the deadline set forth above, there shall be no Reserve Price for the sale of the America First Collateral during the second phase of the Estate Auction, and the Disbursing Agent at the request of the Reorganized Debtor Subcommittee shall distribute to America First on or before June 15, 2012, the amount for which the America First Collateral was sold during the second phase less America First's share of the Estate Auction Holdbacks, and such distribution shall be in full satisfaction of the Class 3 Claim of America First, with no unsecured deficiency claim for America First.  If America First designates the America First Reserve Price by the deadline set forth above, but there is no bid for the America First Collateral equal to or in excess of the America First Reserve Price during the second phase of the Estate Auction, America First will still have the right during the second phase of the Estate Auction to accept whatever price is bid for the America First Collateral, and the Disbursing Agent at the request of the Reorganized Debtor Subcommittee shall distribute to America First on or before June 15, 2012, the amount of the lower bid accepted by America First less America First's share of the Estate Auction Holdbacks, and such distribution shall be in full satisfaction of the Class 3 Claim of America First, with no unsecured deficiency claim for America First.  If America First decides to not accept such lower bid for the America First Collateral, then the America First Collateral will not be sold at the Estate Auction, and the Reorganized Debtor will convey the America First Collateral to America First pursuant to a Quitclaim Deed with the same terms described in Option A above, and such conveyance to America First will be in full satisfaction of the Class 3 Claim of America First, with no unsecured deficiency claim for America First.

     The payment received by America First of its share of the Estate Auction proceeds, whether pursuant to a distribution from the Disbursing Agent at the request of the Reorganized Debtor Subcommittee or pursuant to the Bankruptcy Court's Final Order in the Interpleader Proceeding or pursuant to the deemed payment to America First from the amount of

the America First credit bid during the first phase of the Estate Auction (if any), will be in full satisfaction of the America First Allowed Secured Claim and in full satisfaction of all indebtedness and any other obligations owed by the Debtor to America First, and America First shall have no unsecured deficiency claim under any circumstances under this Option B.

      4.4    ***Class 4 — Secured Claim of the Farm Bureau***

      (a)    <u>Classification.</u>  The Class 4 Claim consists of the Allowed Secured Claim of Farm Bureau Life Insurance Company of Michigan (the "Farm Bureau").

      (b)    <u>Treatment.</u>  The Farm Bureau, the holder of the Allowed Secured Claim of this Class, shall receive the following treatment:

      (1)    <u>Retention of Liens.</u>  Subject to the provisions outlined below, the Farm Bureau shall retain all prepetition Liens securing the Allowed Secured Claim of this Class having the same rights and priorities accorded to such Liens as of the Petition Date.  If the Farm Bureau elects Option B below, the Reorganized Debtor Subcommittee shall have the right to sell the Farm Bureau Collateral free and clear of the Farm Bureau Liens, with such Liens to attach to the Estate Auction proceeds as more fully outlined below.

      (2)    <u>Application of the Farm Bureau's Cash Collateral.</u>  Any cash Collateral that is not subject to a Section 506(c) claim against the Farm Bureau or that has not previously been authorized to be used by the Debtor that arises from the use of the Debtor's Pineview Center facilities that are encumbered by the Farm Bureau's Liens (the amount of such cash Collateral to be determined by the Bankruptcy Court during the Confirmation Hearing or other hearing specifically for this purpose) shall be paid by the Disbursing Agent at the request of the Reorganized Debtor to the Farm Bureau and applied to the Farm Bureau Secured Claim on the date of the Estate Auction, thereby reducing the amount owed on the Farm Bureau Allowed Secured Claim.

      (3)    <u>Optional Treatment:  Abandonment of the Farm Bureau's Collateral With Right to Assert Deficiency Claim, or Estate Auction Sale by Estate Auctioneer with Reserve Price and With No Deficiency Claim.</u>  The holder of the Allowed Secured Claim of the Farm Bureau shall exercise in writing one of the following two options no later than 5:00 p.m. on the next Business Day following the completion of the Confirmation Hearing.  If the Farm Bureau fails to deliver to the Reorganized Debtor Subcommittee its written decision to exercise Option A or Option B as set forth below no later than 5:00 p.m. on the next Business Day following the completion of the Confirmation Hearing, the Farm Bureau shall be deemed to have irrevocably accepted Option B below.

      (A) <u>Option A</u>:  Under this Option A only, the Farm Bureau Secured Claim shall be Allowed in the amount of $4,096,129.22, the amount set forth in the Schedules for the Farm Bureau Secured Claim.  The Farm Bureau Collateral shall be abandoned by the Reorganized Debtor to the Farm Bureau as soon as practicable after the Farm Bureau has elected Option A, and this shall be accomplished by the Reorganized Debtor Subcommittee on behalf of the Reorganized Debtor delivering to the Farm Bureau or to the Farm Bureau's

Nominee a Quitclaim Deed to the Farm Bureau Collateral.  The Quitclaim Deed shall expressly state the following:  (i) the Farm Bureau Collateral is being conveyed to the Farm Bureau or to the Farm Bureau's Nominee subject to all existing Liens of record, including without limitation the Liens of Weber County on the Farm Bureau Collateral, (ii) there shall be no merger of title between the Farm Bureau's Liens, which will remain in effect and are not terminated under this Plan, and ownership of the Farm Bureau Collateral, and (iii) the Farm Bureau is entitled to foreclose its preserved Liens against the Farm Bureau Collateral.

Within three months of the delivery of the Quitclaim Deed to the Farm Bureau or the Farm Bureau's Nominee, if the Farm Bureau claims that the Farm Bureau Collateral Value is not equal to the amount of the Farm Bureau Allowed Secured Claim and that the Farm Bureau is entitled to an unsecured deficiency claim, the Farm Bureau shall file an adversary proceeding in the Bankruptcy Court asserting the amount of its deficiency claim, and the Bankruptcy Court shall determine the amount of the Farm Bureau's deficiency claim by applying deficiency rules consistent with the deficiency rules in Utah Code Ann. Section 57-1-32 (including the provisions in that Section for the award of costs and reasonable attorney fees to the prevailing party) and other applicable Utah law for the assertion of a deficiency claim following a foreclosure sale.  The amount of the Farm Bureau's deficiency claim as determined by a Final Order shall be an Allowed Unsecured Claim under Class 13.  If the Farm Bureau does not file such adversary proceeding within the three months deadline, the Farm Bureau Allowed Secured Claim shall be deemed to have been satisfied in full by the abandonment of the Farm Bureau Collateral, and the Farm Bureau shall be barred from asserting any deficiency claim or any Allowed Unsecured Claim under Class 13.  The Reorganized Debtor reserves its right to assert a Section 506(c) Claim against the Farm Bureau under this Option A.

(B)  Option B:  Under this Option B, the Reorganized Debtor will not assert any Section 506(c) Claim against the Farm Bureau unless the Farm Bureau exercises its credit bid rights below.  The Estate Auctioneer shall endeavor to sell the Farm Bureau Collateral on behalf of the Reorganized Debtor at the Estate Auction, along with all other Estate assets to be sold at the Estate Auction.  On or before 5:00 p.m. on the next Business Day following the completion of the Confirmation Hearing, the Farm Bureau shall notify the Reorganized Debtor Subcommittee in writing of the minimum reserve price (the "Farm Bureau Reserve Price") for the Farm Bureau Collateral to be sold at the Estate Auction. The Farm Bureau Reserve Price cannot exceed the Allowed amount of $4,096,129.22 for the Farm Bureau Claim set forth in Option A above, less the amount of the Cash Collateral paid to the Farm Bureau as outlined above.  If the Farm Bureau does not designate the amount of the Farm Bureau Reserve Price by this deadline, the Reorganized Debtor Subcommittee will set the Reserve Price for the Farm Bureau Collateral at an amount equal to fifty percent (50%) of the Allowed amount for the Farm Bureau Claim, but that Reserve Price will only apply to the first phase of the Estate Auction, and will not apply to the second phase of the Estate Auction.

The Reorganized Debtor Subcommittee will inform the Estate Auctioneer of the amount of the Farm Bureau Reserve Price. As outlined in Section 4.3 above, the Reorganized Debtor Subcommittee shall also have the right to set a Reserve Price for the Unencumbered Assets.  The potential bidders for the Estate Auction will be informed by the Estate Auctioneer in advance of the Estate Auction that Reserve Prices have been set for all of

the Estate assets being sold at the Estate Auction, but the Estate Auctioneer will not disclose to the potential bidders the amounts of any of the Reserve Prices in advance of or at the Estate Auction.

The Estate Auctioneer will then conduct the Estate Auction through potentially two phases. The Estate Auctioneer will first attempt to auction all of the Debtor's assets being sold at the Estate Auction together as one combined unit for an amount that is in excess of the aggregate amount of all of the Reserve Prices for the America First Collateral, the Farm Bureau Collateral, the Zions Bank Collateral, the Wolf Creek Investors Collateral, and the Unencumbered Assets.

If the first phase of the Estate Auction results in a successful sale for an amount equal to these aggregate Reserve Prices, then on or before June 15, 2012, the Disbursing Agent at the request of the Reorganized Debtor Subcommittee shall distribute to the Farm Bureau the amount of the Farm Bureau Reserve Price minus the Farm Bureau's share of the Estate Auction Holdbacks, which distribution to Farm Bureau will be in full satisfaction of the Class 4 Claim of the Farm Bureau, with no unsecured deficiency claim for the Farm Bureau. If the first phase of the Estate Auction results in a successful sale for an amount in excess of these aggregate Reserve Prices, then on or before June 15, 2012, the Disbursing Agent at the request of the Reorganized Debtor Subcommittee shall distribute to the Farm Bureau the amount of the Farm Bureau Reserve Price minus the Farm Bureau's share of the Estate Auction Holdbacks, and the Reorganized Debtor Subcommittee will also propose at that time to all of the Secured Creditors whose Collateral was sold at the Estate Auction its proposed allocation of the excess proceeds among the various claimants to such excess proceeds, including any allocation attributable to the Unencumbered Assets. If the various claimants to such excess proceeds do not agree to the Reorganized Debtor Subcommittee's proposed allocation of such excess proceeds by July 13, 2012, the Reorganized Debtor will interplead such excess proceeds with the Bankruptcy Court by filing the Interpleader Proceeding, and the various claimants to the Estate Auction Proceeds will bear their own expenses in connection with the Interpleader Proceeding. The Bankruptcy Court will determine the final distributions of such excess proceeds from the Estate Auction among the various claimants (including the allocation to the Reorganized Debtor of any excess proceeds allocable to the Unencumbered Assets) by a Final Order entered in the Interpleader Proceeding.

The Farm Bureau shall have the right to participate in the bidding for the first phase of the Estate Auction; provided, however, that the Farm Bureau shall only have the right to make a combined credit bid and Cash bid for the entire asset package being sold at the Estate Auction, and the Farm Bureau shall not have the right to remove the Farm Bureau Collateral from the Estate Auction or to credit bid only for the Farm Bureau Collateral. If the Farm Bureau elects to participate in the bidding for the first phase of the Estate Auction, the Farm Bureau must identify separately the amount of its credit bid (which must be in the amount of the Farm Bureau Reserve Price, and which will only be allocable to the Farm Bureau Collateral, and will not be allocable to the purchase of any other property) and the amount of its Cash bid for the remainder of the Debtor's assets that are being sold at the Estate Auction (which must be payable in Cash). If the Farm Bureau is the successful bidder for the first phase of the Estate Auction, the Farm Bureau will be responsible to pay all of the closing costs and auction

commissions and other expenses from the Estate Auction as well as the Farm Bureau's share of all other Estate Auction Holdbacks, and the Farm Bureau will also be responsible for any other Section 506(c) expenses that the Bankruptcy Court determines are allocable to the Farm Bureau.

If the Estate Auctioneer is unsuccessful in obtaining a price that is equal to or in excess of the aggregate Reserve Prices for the first phase of the Estate Auction, the Estate Auctioneer will immediately go to the second phase of the Estate Auction and attempt to auction the Debtor's assets as separate lots in the following order, with the collateral of each Secured Creditor outlined below to be sold as a combined unit and subject to the Reserve Price (if any) established by such Secured Creditor for its collateral: (1) the America First Collateral; (2) the Farm Bureau Collateral; (3) the Zions Bank Collateral; (4) the Wolf Creek Investors Collateral; and (5) the Unencumbered Assets. If two or more of the Secured Creditors agree that their Collateral should be sold together as one unit, rather than separate units, they shall inform the Estate Auctioneer of their agreement at the beginning of the second phase of the Estate Auction. If the Estate Auctioneer does not receive a bid for the Unencumbered Assets during the second phase of the Estate Auction for the Reserve Price set by the Reorganized Debtor Subcommittee, then the Reorganized Debtor Subcommittee will be authorized to proceed to liquidate the Unencumbered Assets as outlined in Section 4.3 above.

If the second phase of the Estate Auction results in a successful sale of the Farm Bureau Collateral for an amount equal to or greater than the Farm Bureau Release Price that was set by the Farm Bureau by the deadline outlined above, then on or before June 15, 2012, the Disbursing Agent at the request of the Reorganized Debtor Subcommittee shall distribute to the Farm Bureau the amount bid for the Farm Bureau Collateral at the second phase of the Estate Auction minus the Farm Bureau's share of the Estate Auction Holdbacks, which distribution to the Farm Bureau will be in full satisfaction of the Class 4 Claim of the Farm Bureau, with no unsecured deficiency claim for the Farm Bureau. If the Farm Bureau does not designate the Farm Bureau Reserve Price by the deadline set forth above, there shall be no Reserve Price for the sale of the Farm Bureau Collateral during the second phase of the Estate Auction, and the Disbursing Agent at the request of the Reorganized Debtor Subcommittee shall distribute to the Farm Bureau on or before June 15, 2012, the amount for which the Farm Bureau Collateral was sold during the second phase less the Farm Bureau's share of the Estate Auction Holdbacks, and such distribution shall be in full satisfaction of the Class 4 Claim of the Farm Bureau, with no unsecured deficiency claim for the Farm Bureau. If the Farm Bureau designates the Farm Bureau Reserve Price by the deadline set forth above, but there is no bid for the Farm Bureau Collateral equal to or in excess of the Farm Bureau Reserve Price during the second phase of the Estate Auction, the Farm Bureau will still have the right during the second phase of the Estate Auction to accept whatever price is bid for the Farm Bureau Collateral, and the Disbursing Agent at the request of the Reorganized Debtor Subcommittee shall distribute to the Farm Bureau on or before June 15, 2012, the amount of the lower bid accepted by the Farm Bureau less the Farm Bureau's share of the Estate Auction Holdbacks, and such distribution shall be in full satisfaction of the Class 4 Claim of the Farm Bureau, with no unsecured deficiency claim for the Farm Bureau. If the Farm Bureau decides to not accept such lower bid for the Farm Bureau Collateral, then the Farm Bureau Collateral will not be sold at the Estate Auction, and the Reorganized Debtor will convey the Farm Bureau Collateral to the Farm Bureau pursuant to a Quitclaim Deed with the same terms described in Option A above, and such conveyance to the

Farm Bureau will be in full satisfaction of the Class 4 Claim of the Farm Bureau, with no unsecured deficiency claim for the Farm Bureau.

The payment received by the Farm Bureau of its share of the Estate Auction proceeds, whether pursuant to a distribution from the Disbursing Agent at the request of the Reorganized Debtor Subcommittee or pursuant to the Bankruptcy Court's Final Order in the Interpleader Proceeding or pursuant to the deemed payment to the Farm Bureau from the amount of the Farm Bureau credit bid during the first phase of the Estate Auction (if any), will be in full satisfaction of the Farm Bureau Allowed Secured Claim and in full satisfaction of all indebtedness and any other obligations owed by the Debtor to the Farm Bureau, and the Farm Bureau shall have no unsecured deficiency claim under any circumstances under this Option B.

### 4.5    *Class 5 — Secured Claim of Zions First National Bank*

(a)    Classification.  The Class 5 Claim consists of the Allowed Secured Claim of Zions First National Bank ("Zions Bank").

(b)    Treatment.  Zions Bank, the holder of the Allowed Secured Claim of this Class, shall receive the following treatment:

(1)    Retention of Liens.  Subject to the provisions outlined below, Zions Bank shall retain all prepetition Liens securing the Allowed Secured Claim of this Class having the same rights and priorities accorded to such Liens as of the Petition Date.  If Zions Bank elects Option B below, the Reorganized Debtor Subcommittee shall have the right to sell the Zions Bank Collateral free and clear of the Zions Bank Liens, with such Liens to attach to the Estate Auction proceeds as more fully outlined below.

(2)    Optional Treatment:  Abandonment of Zions Bank's Collateral With Right to Assert Deficiency Claim, or Estate Auction Sale by Estate Auctioneer with Reserve Price and With No Deficiency Claim.  The holder of the Allowed Secured Claim of Zions Bank shall exercise in writing one of the following two options no later than 5:00 p.m. on the next Business Day following the completion of the Confirmation Hearing.  If Zions Bank fails to deliver to the Reorganized Debtor Subcommittee its written decision to exercise Option A or Option B as set forth below no later than 5:00 p.m. on the next Business Day following the completion of the Confirmation Hearing, Zions Bank shall be deemed to have irrevocably accepted Option B below.

(A)    Option A:  Under this Option A only, the Zions Bank Secured Claim shall be Allowed in the lesser amount of $2,100,000 or such amount as is actually owed to Zions Bank as of the Effective Date.  The Zions Bank Secured Claim is believed to be oversecured as of the Effective Date.  Therefore, consistent with Section 506(b) of the Bankruptcy Code, if the Zions Bank Secured Claim is ultimately determined to have been oversecured as of the Petition Date, there shall be allowed to Zions Bank from the Petition Date to the Effective Date, additional interest on the Zions Bank Allowed Secured Claim at the non-default interest rate set forth in the Zions Bank loan documents and any reasonable post-Petition Date fees, costs, or charges provided for under the Zions Bank loan documents, plus additional

interest on the Zions Bank Allowed Secured Claim at the Plan Interest Rate from the Effective Date until such time as the Zions Bank Collateral is abandoned to Zions Bank under this Option A.  The  Zions Bank Collateral shall be abandoned by the Reorganized Debtor to Zions Bank as soon as practicable after Zions Bank has elected Option A, and this shall be accomplished by the Reorganized Debtor Subcommittee delivering to Zions Bank or to Zions Bank's Nominee a Quitclaim Deed to the Zions Bank Collateral.  The Quitclaim Deed shall expressly state the following:  (i) the Zions Bank Collateral is being conveyed to Zions Bank or to Zions Bank's Nominee subject to all existing Liens of record, including without limitation the Liens of Weber County on the Zions Bank Collateral, (ii) there shall be no merger of title between Zions Bank's Liens, which will remain in effect and are not terminated under this Plan, and ownership of Zions Bank Collateral, and (iii) Zions Bank is entitled to foreclose its preserved Liens against the Zions Bank Collateral.

Within three months of the delivery of the Quitclaim Deed to Zions Bank or Zions Bank's Nominee, if Zions Bank claims that the Zions Bank Collateral Value is not equal to the amount of the Zions Bank Allowed Secured Claim and that Zions Bank is entitled to an unsecured deficiency claim, Zions Bank shall file an adversary proceeding in the Bankruptcy Court asserting the amount of its deficiency claim, and the Bankruptcy Court shall determine the amount of Zions Bank's deficiency claim by applying deficiency rules consistent with the deficiency rules in Utah Code Ann. Section 57-1-32 (including the provisions in that Section for the award of costs and reasonable attorney fees to the prevailing party) and other applicable Utah law for the assertion of a deficiency claim following a foreclosure sale.  The amount of Zions Bank's deficiency claim as determined by a Final Order shall be an Allowed Unsecured Claim under Class 13.  If Zions Bank does not file such adversary proceeding within the three months deadline, the Zions Bank Allowed Secured Claim shall be deemed to have been satisfied in full by the abandonment of the Zions Bank Collateral, and Zions Bank shall be barred from asserting any deficiency claim or any Allowed Unsecured Claim under Class 13 in connection with the Zions Bank Allowed Secured Claim (although Zions Bank will be entitled to continue to assert the unrelated unsecured claims that Zions Bank filed separately from its Secured Claim as Proof of Claim Nos. 99-102).  The Reorganized Debtor Subcommittee reserves its right to assert a Section 506(c) Claim against Zions Bank under this Option A.

(B)  Option B:  Under this Option B, the Reorganized Debtor will not assert any Section 506(c) Claim against Zions Bank unless Zions Bank exercises its credit bid rights below.  The Estate Auctioneer will endeavor to sell the Zions Bank Collateral on behalf of the Reorganized Debtor at the Estate Auction, along with all other Estate assets to be sold at the Estate Auction.  On or before 5:00 p.m. on the next Business Day following the completion of the Confirmation Hearing, Zions Bank shall notify the Reorganized Debtor Subcommittee in writing of the minimum reserve price (the "Zions Bank Reserve Price") for the Zions Bank Collateral to be sold at the Estate Auction. The Zions Bank Reserve Price cannot exceed the Allowed amount for the Zions Bank Claim set forth in Option A above.  If Zions Bank does not designate the amount of the Zions Bank Reserve Price by this deadline, the Reorganized Debtor Subcommittee will set the Reserve Price for the Zions Bank Collateral at an amount equal to fifty percent (50%) of the Allowed amount for the Zions Bank Claim, but that Reserve Price will only apply to the first phase of the Estate Auction, and will not apply to the second phase of the Estate Auction.

36

The Reorganized Debtor Subcommittee will inform the Estate Auctioneer of the amount of the Zions Bank Reserve Price. As outlined in Section 4.3 above, the Reorganized Debtor Subcommittee shall also have the right to set a Reserve Price for the Unencumbered Assets.  The potential bidders for the Estate Auction will be informed by the Estate Auctioneer in advance of the Estate Auction that Reserve Prices have been set for all of the Estate assets being sold at the Estate Auction, but the Estate Auctioneer will not disclose to the potential bidders the amounts of any of the Reserve Prices in advance of or at the Estate Auction.

The Estate Auctioneer will then conduct the Estate Auction through potentially two phases.  The Estate Auctioneer will first attempt to auction all of the Debtor's assets being sold at the Estate Auction together as one combined unit for an amount that is in excess of the aggregate amount of all of the Reserve Prices for the America First Collateral, the Farm Bureau Collateral, the Zions Bank Collateral, the Wolf Creek Investors Collateral, and the Unencumbered Assets.

If the first phase of the Estate Auction results in a successful sale for an amount equal to these aggregate Reserve Prices, then on or before June 15, 2012, the Disbursing Agent at the request of the Reorganized Debtor Subcommittee shall distribute to Zions Bank the amount of the Zions Bank Reserve Price minus Zions Bank's share of the Estate Auction Holdbacks, which distribution to Zions Bank will be in full satisfaction of the Class 5 Claim of Zions Bank, with no unsecured deficiency claim for Zions Bank.  If the first phase of the Estate Auction results in a successful sale for an amount in excess of these aggregate Reserve Prices, then on or before June 15, 2012, the Disbursing Agent at the request of the Reorganized Debtor Subcommittee shall distribute to Zions Bank the amount of the Zions Bank Reserve Price minus Zions Bank's share of the Estate Auction Holdbacks, and the Reorganized Debtor Subcommittee will also propose at that time to all of the Secured Creditors whose Collateral was sold at the Estate Auction its proposed allocation of the excess proceeds among the various claimants to such excess proceeds, including any allocation attributable to the Unencumbered Assets.  If the various claimants to such excess proceeds do not agree to the Reorganized Debtor Subcommittee's proposed allocation of such excess proceeds by July 13, 2012, the Reorganized Debtor will interplead such excess proceeds with the Bankruptcy Court by filing the Interpleader Proceeding, and the various claimants to the Estate Auction Proceeds will bear their own expenses in connection with the Interpleader Proceeding.  The Bankruptcy Court will determine the final distributions of such excess proceeds from the Estate Auction among the various claimants (including the allocation to the Reorganized Debtor of any excess proceeds allocable to the Unencumbered Assets) by a Final Order entered in the Interpleader Proceeding.

Zions Bank shall have the right to participate in the bidding for the first phase of the Estate Auction; provided, however, that Zions Bank shall only have the right to make a combined credit bid and Cash bid for the entire asset package being sold at the Estate Auction, and Zions Bank shall not have the right to remove the Zions Bank Collateral from the Estate Auction or to credit bid only for the Zions Bank Collateral.  If Zions Bank elects to participate in the bidding for the first phase of the Estate Auction, Zions Bank must identify separately the amount of its credit bid (which must be in the amount of the Zions Bank Reserve Price, and which will only be allocable to the Zions Bank Collateral, and will not be allocable to

the purchase of any other property) and the amount of its Cash bid for the remainder of the
Debtor's assets that are being sold at the Estate Auction (which must be payable in Cash). If
Zions Bank is the successful bidder for the first phase of the Estate Auction, Zions Bank will be
responsible to pay all of the closing costs and auction commissions and other expenses from the
Estate Auction as well as Zions Bank's share of all other Estate Auction Holdbacks, and Zions
Bank will also be responsible for any other Section 506(c) expenses that the Bankruptcy Court
determines are allocable to Zions Bank.

   If the Estate Auctioneer is unsuccessful in obtaining a price that is
equal to or in excess of the aggregate Reserve Prices for the first phase of the Estate Auction, the
Estate Auctioneer will immediately go to the second phase of the Estate Auction and attempt to
auction the Debtor's assets as separate lots in the following order, with the collateral of each
Secured Creditor outlined below to be sold as a combined unit and subject to the Reserve Price
(if any) established by such Secured Creditor for its collateral: (1) the America First Collateral;
(2) the Farm Bureau Collateral; (3) the Zions Bank Collateral; (4) the Wolf Creek Investors
Collateral; and (5) the Unencumbered Assets. If two or more of the Secured Creditors agree that
their Collateral should be sold together as one unit, rather than separate units, they shall inform
the Estate Auctioneer of their agreement at the beginning of the second phase of the Estate
Auction. If the Estate Auctioneer does not receive a bid for the Unencumbered Assets during the
second phase of the Estate Auction for the Reserve Price set by the Reorganized Debtor
Subcommittee, then the Reorganized Debtor Subcommittee will be authorized to proceed to
liquidate the Unencumbered Assets as outlined in Section 4.3 above.

   If the second phase of the Estate Auction results in a successful
sale of the Zions Bank Collateral for an amount equal to or greater than the Zions Bank Release
Price that was set by Zions Bank by the deadline outlined above, then on or before June 15,
2012, the Disbursing Agent at the request of the Reorganized Debtor Subcommittee shall
distribute to Zions Bank the amount bid for the Zions Bank Collateral at the second phase of the
Estate Auction minus Zions Bank's share of the Estate Auction Holdbacks, which distribution to
the Zions Bank will be in full satisfaction of the Class 5 Claim of Zions Bank, with no unsecured
deficiency claim for Zions Bank. If Zions Bank does not designate the Zions Bank Reserve
Price by the deadline set forth above, there shall be no Reserve Price for the sale of the Zions
Bank Collateral during the second phase of the Estate Auction, and the Disbursing Agent at the
request of the Reorganized Debtor Subcommittee shall distribute to Zions Bank on or before
June 15, 2012, the amount for which the Zions Bank Collateral was sold during the second phase
less Zions Bank's share of the Estate Auction Holdbacks, and such distribution shall be in full
satisfaction of the Class 5 Claim of Zions Bank, with no unsecured deficiency claim for Zions
Bank. If Zions Bank designates the Zions Bank Reserve Price by the deadline set forth above,
but there is no bid for the Zions Bank Collateral equal to or in excess of the Zions Bank Reserve
Price during the second phase of the Estate Auction, Zions Bank will still have the right during
the second phase of the Estate Auction to accept whatever price is bid for the Zions Bank
Collateral, and the Disbursing Agent at the request of the Reorganized Debtor Subcommittee
shall distribute to Zions Bank on or before June 15, 2012, the amount of the lower bid accepted
by Zions Bank less Zions Bank's share of the Estate Auction Holdbacks, and such distribution
shall be in full satisfaction of the Class 5 Claim of Zions Bank, with no unsecured deficiency
claim for Zions Bank. If Zions Bank decides to not accept such lower bid for the Zions Bank

Collateral, then the Zions Bank Collateral will not be sold at the Estate Auction, and the Reorganized Debtor will convey the Zions Bank Collateral to Zions Bank pursuant to a Quitclaim Deed with the same terms described in Option A above, and such conveyance to Zions Bank will be in full satisfaction of the Class 5 Claim of Zions Bank, with no unsecured deficiency claim for Zions Bank.

The payment received by Zions Bank of its share of the Estate Auction proceeds, whether pursuant to a distribution from the Disbursing Agent at the request of the Reorganized Debtor Subcommittee or pursuant to the Bankruptcy Court's Final Order in the Interpleader Proceeding or pursuant to the deemed payment to Zions Bank from the amount of the Zions Bank credit bid during the first phase of the Estate Auction (if any), will be in full satisfaction of the Zions Bank Allowed Secured Claim and in full satisfaction of all indebtedness and any other obligations owed by the Debtor to Zions Bank, and Zions Bank shall have no unsecured deficiency claim under any circumstances under this Option B.

4.6    ***Class 6 — Secured Claim of Capon Capital, LLC***

(a)    Classification.  The Class 6 Claim consists of the Allowed Secured Claim of Capon Capital, LLC ("Capon Capital").

(b)    Treatment.  Capon Capital, the holder of the Allowed Secured Claim of this Class, shall receive the following treatment:

(1)    The Capon Capital Secured Claim shall be Allowed in the amount of $691,390.88, the total amount set forth in the Capon Capital proof of claim.  There is a dispute between the relative priorities of the real estate Lien of Capon Capital and the Lien of Marriott Construction in Class 8.  On the Effective Date, or as soon thereafter as is practicable, the Reorganized Debtor Subcommittee on behalf of the Reorganized Debtor shall prepare and sign three (3) separate Quitclaim Deeds, one Quitclaim Deed for Parcel No. 0001, and two Quitclaim Deeds for Parcel No. 0064.  The Parcel No. 0001 Quitclaim Deed shall expressly state the following:  (i) Parcel No. 0001 is being conveyed to Capon Capital or to Capon Capital's Nominee subject to all existing Liens of record, including without limitation the Liens of Weber County on the Capon Capital Collateral, (ii) there shall be no merger of title between Capon Capital's Lien on Parcel No. 0001, which will remain in effect and is not terminated under this Plan, and ownership of Parcel No. 0001, and (iii) Capon Capital is entitled to foreclose its preserved Lien against Parcel No. 0001.

The Parcel No. 0064 Quitclaim Deeds shall expressly state the following:  (i) Parcel No. 0064 is being conveyed to Capon Capital/Marriott Construction or its Nominee subject to all existing Liens of record, including without limitation the Liens of Weber County, Capon Capital, and Marriott Construction on Parcel No. 0064, (ii) there shall be no merger of title between Capon Capital's and Marriott Construction's Liens on Parcel No. 0064, which will remain in effect and are not terminated under this Plan, and ownership of Parcel No. 0064, and (iii) Capon Capital/Marriott Construction are entitled to foreclose their preserved Liens against Parcel No. 0064.  The Parcel No. 0001 Quitclaim Deed shall be delivered immediately to Capon Capital.  The Parcel No. 0064 Quitclaim Deeds shall be delivered by the

Reorganized Debtor Subcommittee to the law firm of Kirton & McConkie and held in escrow by the law firm of Kirton & McConkie until such time as there is a stipulation between Capon Capital and Marriott Construction as to the lien priority of their respective Liens, or a court of competent jurisdiction issues a Final Order, determining whether the Capon Capital Lien or the Marriott Construction Lien has priority, and the time period for appeal from such Final Order has expired (the "Priority Dispute Resolution").  Upon the occurrence of the Priority Dispute Resolution, the law firm of Kirton & McConkie shall release for recording the Parcel No. 0064 Quitclaim Deed to the party that has been determined to be in first priority pursuant to the Priority Dispute Resolution, and the other Parcel No. 0064 Quitclaim Deed shall be destroyed by the law firm of Kirton & McConkie.

Within three months of the Effective Date, if Capon Capital claims that the Capon Capital Collateral Value is not equal to the amount of the Capon Capital Allowed Secured Claim and that Capon Capital is entitled to an unsecured deficiency claim, Capon Capital shall file an adversary proceeding in the Bankruptcy Court asserting the amount of its deficiency claim, and the Bankruptcy Court shall determine the amount of Capon Capital's deficiency claim by applying deficiency rules consistent with the deficiency rules in Utah Code Ann. Section 57-1-32 (including the provisions in that Section for the award of costs and reasonable attorney fees to the prevailing party, but not including any amount of costs or attorney fees incurred by Capon Capital in resolving the Lien priority dispute with Marriott Construction) and other applicable Utah law for the assertion of a deficiency claim following a foreclosure sale. The amount of Capon Capital's deficiency claim as determined by a Final Order shall be an Allowed Unsecured Claim under Class 13.  If Capon Capital does not file such adversary proceeding within the three months deadline, the Capon Capital Allowed Secured Claim shall be deemed to have been satisfied in full, and Capon Capital shall be barred from asserting any deficiency claim or any Allowed Unsecured Claim under Class 13 in connection with the Capon Capital Allowed Secured Claim.  The Reorganized Debtor Subcommittee reserves its right to assert a Section 506(c) Claim against Capon Capital in the event Capon Capital asserts an unsecured deficiency claim.

### 4.7    *Class 7 — Secured Claim of Wolf Creek First Mortgage Investors, L.P.*

(a)    Classification.  The Class 7 Claim consists of the Allowed Secured Claim of Wolf Creek First Mortgage Investors, L.P. ("Wolf Creek Investors").

(b)    Treatment.  Wolf Creek Investors, the holder of the Allowed Secured Claim of this Class, shall receive the following treatment:

(1)    Retention of Liens.  Subject to the provisions outlined below, the Wolf Creek Investors shall retain all prepetition Liens securing the Allowed Secured Claim of this Class having the same rights and priorities accorded to such Liens as of the Petition Date.  If the Wolf Creek Investors elects Option B below, the Reorganized Debtor Subcommittee shall have the right to sell the Wolf Creek Investors Collateral free and clear of the Wolf Creek Investors Liens, with such Liens to attach to the Estate Auction proceeds as more fully outlined below.

(2)    Optional Treatment:  Abandonment of the Wolf Creek Investors Collateral With Right to Assert Deficiency Claim, or Estate Auction Sale by Estate Auctioneer with Reserve Price and With No Deficiency Claim.  The holder of the Allowed Secured Claim of the Wolf Creek Investors shall exercise in writing one of the following two options no later than 5:00 p.m. on the next Business Day following the completion of the Confirmation Hearing.  If the Wolf Creek Investors fail to deliver to the Reorganized Debtor Subcommittee their written decision to exercise Option A or Option B as set forth below no later than 5:00 p.m. on the next Business Day following the completion of the Confirmation Hearing, the Wolf Creek Investors shall be deemed to have irrevocably accepted Option B below.

(A)  Option A:  Under this Option A only, the Wolf Creek Investors Secured Claim shall be Allowed in the amount of $1,671,109.38, the amount set forth in the Wolf Creek Investors Proof of Claim.  The Wolf Creek Investors Collateral shall be abandoned by the Reorganized Debtor to the Wolf Creek Investors as soon as practicable after the Wolf Creek Investors have elected Option A, and this shall be accomplished by the Reorganized Debtor Subcommittee on behalf of the Reorganized Debtor delivering to the Wolf Creek Investors or to the Wolf Creek Investors' Nominee a Quitclaim Deed to the Wolf Creek Investors Collateral.  The Quitclaim Deed shall expressly state the following:  (i) the Wolf Creek Investors Collateral is being conveyed to the Wolf Creek Investors or to the Wolf Creek Investors' Nominee subject to all existing Liens of record, including without limitation the Liens of Weber County on the Wolf Creek Investors Collateral, (ii) there shall be no merger of title between the Wolf Creek Investors' Liens, which will remain in effect and are not terminated under this Plan, and ownership of the Wolf Creek Investors Collateral, and (iii) the Wolf Creek Investors are entitled to foreclose their preserved Liens against the Wolf Creek Investors Collateral.

Within three months of the delivery of the Quitclaim Deed to the Wolf Creek Investors or the Wolf Creek Investors' Nominee, if the Wolf Creek Investors claim that the Wolf Creek Investors Collateral Value is not equal to the amount of the Wolf Creek Investors Allowed Secured Claim and that the Wolf Creek Investors are entitled to an unsecured deficiency claim, the Wolf Creek Investors shall file an adversary proceeding in the Bankruptcy Court asserting the amount of their deficiency claim, and the Bankruptcy Court shall determine the amount of the Wolf Creek Investors' deficiency claim by applying deficiency rules consistent with the deficiency rules in Utah Code Ann. Section 57-1-32 (including the provisions in that Section for the award of costs and reasonable attorney fees to the prevailing party) and other applicable Utah law for the assertion of a deficiency claim following a foreclosure sale.  The amount of the Wolf Creek Investors' deficiency claim as determined by a Final Order shall be an Allowed Unsecured Claim under Class 13.  If the Wolf Creek Investors do not file such adversary proceeding within the three months deadline, the Wolf Creek Investors Allowed Secured Claim shall be deemed to have been satisfied in full by the abandonment of the Wolf Creek Investors Collateral, and the Wolf Creek Investors shall be barred from asserting any deficiency claim or any Allowed Unsecured Claim under Class 13.  The Reorganized Debtor Subcommittee reserves its right to assert a Section 506(c) Claim against the Wolf Creek Investors under this Option A.

(B)  Option B:  Under this Option B, the Reorganized Debtor will not assert any Section 506(c) Claim against the Wolf Creek Investors unless the Wolf Creek Investors exercise their credit bid rights below.  The Estate Auctioneer will endeavor to sell the Wolf Creek Investors Collateral on behalf of the Reorganized Debtor at the Estate Auction, along with all other Estate assets to be sold at the Estate Auction.  On or before 5:00 p.m. on the next Business Day following the completion of the Confirmation Hearing, the Wolf Creek Investors shall notify the Reorganized Debtor Subcommittee in writing of the minimum reserve price (the "Wolf Creek Investors Reserve Price") for the Wolf Creek Investors Collateral to be sold at the Estate Auction.  The Wolf Creek Investors Reserve Price cannot exceed the Allowed amount of $1,671,109.38 for the Wolf Creek Investors Claim set forth in Option A above.  If the Wolf Creek Investors do not designate the amount of the Wolf Creek Investors Reserve Price by this deadline, the Reorganized Debtor Subcommittee will set the Reserve Price for the Wolf Creek Investors Collateral at an amount equal to fifty percent (50%) of the Allowed amount for the Wolf Creek Investors Claim, but that Reserve Price will only apply to the first phase of the Estate Auction, and will not apply to the second phase of the Estate Auction.

The Reorganized Debtor Subcommittee will inform the Estate Auctioneer of the amount of the Wolf Creek Investors Reserve Price. As outlined in Section 4.3 above, the Reorganized Debtor Subcommittee shall also have the right to set a Reserve Price for the Unencumbered Assets.  The potential bidders for the Estate Auction will be informed by the Estate Auctioneer in advance of the Estate Auction that Reserve Prices have been set for all of the Estate assets being sold at the Estate Auction, but the Estate Auctioneer will not disclose to the potential bidders the amounts of any of the Reserve Prices in advance of or at the Estate Auction.

The Estate Auctioneer will then conduct the Estate Auction through potentially two phases.  The Estate Auctioneer will first attempt to auction all of the Debtor's assets being sold at the Estate Auction together as one combined unit for an amount that is in excess of the aggregate amount of all of the Reserve Prices for the America First Collateral, the Farm Bureau Collateral, the Zions Bank Collateral, the Wolf Creek Investors Collateral, and the Unencumbered Assets.

If the first phase of the Estate Auction results in a successful sale for an amount equal to these aggregate Reserve Prices, then on or before June 15, 2012, the Disbursing Agent at the request of the Reorganized Debtor Subcommittee shall distribute to the Wolf Creek Investors the amount of the Wolf Creek Investors Reserve Price minus the Wolf Creek Investors' share of the Estate Auction Holdbacks, which distribution to Wolf Creek Investors will be in full satisfaction of the Class 7 Claim of the Wolf Creek Investors, with no unsecured deficiency claim for the Wolf Creek Investors.  If the first phase of the Estate Auction results in a successful sale for an amount in excess of these aggregate Reserve Prices, then on or before June 15, 2012, the Disbursing Agent at the request of the Reorganized Debtor Subcommittee shall distribute to the Wolf Creek Investors the amount of the Wolf Creek Investors Reserve Price minus the Wolf Creek Investors' share of the Estate Auction Holdbacks, and the Reorganized Debtor Subcommittee will also propose at that time to all of the Secured Creditors whose Collateral was sold at the Estate Auction its proposed allocation of the excess proceeds among the various claimants to such excess proceeds, including any allocation

attributable to the Unencumbered Assets. If the various claimants to such excess proceeds do not agree to the Reorganized Debtor Subcommittee's proposed allocation of such excess proceeds by July 13, 2012, the Reorganized Debtor will interplead such excess proceeds with the Bankruptcy Court by filing the Interpleader Proceeding, and the various claimants to the Estate Auction Proceeds will bear their own expenses in connection with the Interpleader Proceeding. The Bankruptcy Court will determine the final distributions of such excess proceeds from the Estate Auction among the various claimants (including the allocation to the Reorganized Debtor of any excess proceeds allocable to the Unencumbered Assets) by a Final Order entered in the Interpleader Proceeding.

The Wolf Creek Investors shall have the right to participate in the bidding for the first phase of the Estate Auction; provided, however, that the Wolf Creek Investors shall only have the right to make a combined credit bid and Cash bid for the entire asset package being sold at the Estate Auction, and the Wolf Creek Investors shall not have the right to remove the Wolf Creek Investors Collateral from the Estate Auction or to credit bid only for the Wolf Creek Investors Collateral. If the Wolf Creek Investors elect to participate in the bidding for the first phase of the Estate Auction, the Wolf Creek Investors must identify separately the amount of their credit bid (which must be in the amount of the Wolf Creek Investors Reserve Price, and which will only be allocable to the Wolf Creek Investors Collateral, and will not be allocable to the purchase of any other property) and the amount of its Cash bid for the remainder of the Debtor's assets that are being sold at the Estate Auction (which must be payable in Cash). If the Wolf Creek Investors are the successful bidder for the first phase of the Estate Auction, the Wolf Creek Investors will be responsible to pay all of the closing costs and auction commissions and other expenses from the Estate Auction as well as the Wolf Creek Investors' share of all other Estate Auction Holdbacks, and the Wolf Creek Investors will also be responsible for any other Section 506(c) expenses that the Bankruptcy Court determines are allocable to the Wolf Creek Investors.

If the Estate Auctioneer is unsuccessful in obtaining a price that is equal to or in excess of the aggregate Reserve Prices for the first phase of the Estate Auction, the Estate Auctioneer will immediately go to the second phase of the Estate Auction and attempt to auction the Debtor's assets as separate lots in the following order, with the collateral of each Secured Creditor outlined below to be sold as a combined unit and subject to the Reserve Price (if any) established by such Secured Creditor for its collateral: (1) the America First Collateral; (2) the Farm Bureau Investors Collateral; (3) the Zions Bank Collateral; (4) the Wolf Creek Investors Collateral; and (5) the Unencumbered Assets. If two or more of the Secured Creditors agree that their Collateral should be sold together as one unit, rather than separate units, they shall inform the Estate Auctioneer of their agreement at the beginning of the second phase of the Estate Auction. If the Estate Auctioneer does not receive a bid for the Unencumbered Assets during the second phase of the Estate Auction for the Reserve Price set by the Reorganized Debtor Subcommittee, then the Reorganized Debtor Subcommittee will be authorized to proceed to liquidate the Unencumbered Assets as outlined in Section 4.3 above.

If the second phase of the Estate Auction results in a successful sale of the Wolf Creek Investors Collateral for an amount equal to or greater than the Wolf Creek Investors Release Price that was set by the Wolf Creek Investors by the deadline outlined above,

then on or before June 15, 2012, the Disbursing Agent at the request of the Reorganized Debtor Subcommittee shall distribute to the Wolf Creek Investors the amount bid for the Wolf Creek Investors Collateral at the second phase of the Estate Auction minus the Wolf Creek Investors' share of the Estate Auction Holdbacks, which distribution to the Wolf Creek Investors will be in full satisfaction of the Class 4 Claim of the Wolf Creek Investors, with no unsecured deficiency claim for the Wolf Creek Investors.  If the Wolf Creek Investors do not designate the Wolf Creek Investors Reserve Price by the deadline set forth above, there shall be no Reserve Price for the sale of the Wolf Creek Investors Collateral during the second phase of the Estate Auction, and the Disbursing Agent at the request of the Reorganized Debtor Subcommittee shall distribute to the Wolf Creek Investors on or before June 15, 2012, the amount for which the Wolf Creek Investors Collateral was sold during the second phase less the Wolf Creek Investors' share of the Estate Auction Holdbacks, and such distribution shall be in full satisfaction of the Class 4 Claim of the Wolf Creek Investors, with no unsecured deficiency claim for the Wolf Creek Investors. If the Wolf Creek Investors designate the Wolf Creek Investors Reserve Price by the deadline set forth above, but there is no bid for the Wolf Creek Investors Collateral equal to or in excess of the Wolf Creek Investors Reserve Price during the second phase of the Estate Auction, the Wolf Creek Investors will still have the right during the second phase of the Estate Auction to accept whatever price is bid for the Wolf Creek Investors Collateral, and the Disbursing Agent at the request of the Reorganized Debtor Subcommittee shall distribute to the Wolf Creek Investors on or before June 15, 2012, the amount of the lower bid accepted by the Wolf Creek Investors less the Wolf Creek Investors' share of the Estate Auction Holdbacks, and such distribution shall be in full satisfaction of the Class 7 Claim of the Wolf Creek Investors, with no unsecured deficiency claim for the Wolf Creek Investors.  If the Wolf Creek Investors decide to not accept such lower bid for the Wolf Creek Investors Collateral, then the Wolf Creek Investors Collateral will not be sold at the Estate Auction, and the Reorganized Debtor will convey the Wolf Creek Investors Collateral to the Wolf Creek Investors pursuant to a Quitclaim Deed with the same terms described in Option A above, and such conveyance to the Wolf Creek Investors will be in full satisfaction of the Class 7 Claim of the Wolf Creek Investors, with no unsecured deficiency claim for the Wolf Creek Investors.

The payment received by the Wolf Creek Investors of their share of the Estate Auction proceeds, whether pursuant to a distribution from the Disbursing Agent at the request of the Reorganized Debtor Subcommittee or pursuant to the Bankruptcy Court's Final Order in the Interpleader Proceeding or pursuant to the deemed payment to the Wolf Creek Investors from the amount of the Wolf Creek Investors credit bid during the first phase of the Estate Auction (if any), will be in full satisfaction of the Wolf Creek Investors Allowed Secured Claim and in full satisfaction of all indebtedness and any other obligations owed by the Debtor to the Wolf Creek Investors, and the Wolf Creek Investors shall have no unsecured deficiency claim under any circumstances under this Option B.

### 4.8    *Class 8 — Secured Claim of Randy Marriott Construction*

(a)    Classification.  The Class 8 Claim consists of the Allowed Secured Claim of Randy Marriott Construction ("Marriott Construction").

(b)   Treatment.  Marriott Construction, the holder of the Allowed Secured Claim of this Class, shall receive the following treatment:

(1)   The Marriott Construction Secured Claim shall be Allowed in the amount of $449,708.88, the total amount set forth in the Marriott Construction proof of claim. There is a dispute between the relative priorities of the real estate Lien of Capon Capital in Class 6 and the Lien of Marriott Construction in this Class 8.  On the Effective Date, or as soon thereafter as is practicable, the Reorganized Debtor Subcommittee on behalf of the Reorganized Debtor shall prepare and sign two Quitclaim Deeds for Parcel No. 0064.  The Parcel No. 0064 Quitclaim Deeds shall expressly state the following:  (i) Parcel No. 0064 is being conveyed to Capon Capital/Marriott Construction or its Nominee subject to all existing Liens of record, including without limitation the Liens of Weber County, Capon Capital, and Marriott Construction on Parcel No. 0064, (ii) there shall be no merger of title between Capon Capital's and Marriott Construction's Liens on Parcel No. 0064, which will remain in effect and are not terminated under this Plan, and ownership of Parcel No. 0064, and (iii) Capon Capital/Marriott Construction are entitled to foreclose their preserved Liens against Parcel No. 0064.  The Parcel No. 0064 Quitclaim Deed shall be delivered by the Reorganized Debtor Subcommittee to the law firm of Kirton & McConkie and held in escrow by the law firm of Kirton & McConkie until such time as there is a Priority Dispute Resolution as defined in Section 4.6 above.  Upon the occurrence of the Priority Dispute Resolution, the law firm of Kirton & McConkie shall release for recording the Parcel No. 0064 Quitclaim Deed to the party that has been determined to be in first priority pursuant to the Priority Dispute Resolution, and the other Parcel No. 0064 Quitclaim Deed shall be destroyed by the law firm of Kirton & McConkie.

Within three months of the Effective Date, if Marriott Construction claims that the Marriott Construction Collateral Value is not equal to the amount of the Marriott Construction Allowed Secured Claim and that Marriott Construction is entitled to an unsecured deficiency claim, Marriott Construction shall file an adversary proceeding in the Bankruptcy Court asserting the amount of its deficiency claim, and the Bankruptcy Court shall determine the amount of Marriott Construction's deficiency claim by applying deficiency rules consistent with the deficiency rules in Utah Code Ann. Section 57-1-32 (including the provisions in that Section for the award of costs and reasonable attorney fees to the prevailing party, but not including any amount of costs or attorney fees incurred by Capon Capital in resolving the Lien priority dispute with Marriott Construction) and other applicable Utah law for the assertion of a deficiency claim following a foreclosure sale.  The amount of Marriott Construction's deficiency claim as determined by a Final Order shall be an Allowed Unsecured Claim under Class 13.  If Marriott Construction does not file such adversary proceeding within the three months deadline, the Marriott Construction Allowed Secured Claim shall be deemed to have been satisfied in full, and Marriott Construction shall be barred from asserting any deficiency claim or any Allowed Unsecured Claim under Class 13 in connection with the Marriott Construction Allowed Secured Claim.  The Reorganized Debtor Subcommittee reserves its right to assert a Section 506(c) Claim against Marriott Construction in the event Marriott Construction asserts an unsecured deficiency claim.

4.9    ***Class 9 — Secured Claims of Weber County***

(a)    <u>Classification</u>.  The Class 9 Claim consists of all of the Allowed Secured Claims of Weber County, Utah.

(b)    <u>Treatment.</u>  Weber County, the holder of the Allowed Secured Claims of this Class, shall receive the following treatment:

(1)    <u>Allowance of Weber County Secured Claims.</u>  The Weber County Allowed Secured Claims consist of the Weber County Liens for all currently unpaid real property taxes on any the Debtor's various Parcels, together with accrued and unpaid interest and unpaid penalties.  The total amount owed on the Debtor's Parcels for real property taxes is approximately $611,000.  The Weber County Allowed Secured Claims are secured by the various Parcels against which the unpaid Weber County real property taxes have been assessed (the "Weber County Collateral").  It is believed that all of the Weber County Allowed Secured Claims are oversecured as of the Effective Date.  The Weber County Allowed Secured Claims that are determined to have been oversecured as of the Effective Date shall each accrue interest at the statutory rate from the Effective Date until paid.

(2)    <u>Retention of Liens.</u>  Subject to the provisions outlined in this Section 4.9, Weber County shall retain all prepetition Liens that are securing the Claims of Weber County, with the same rights and priorities accorded to such Liens as of the Petition Date.

(3)    <u>Payment of Weber County Claims.</u>  The responsibility for the payment of the Weber County Claims on the Parcels of the Debtor's real property that are abandoned to Secured Creditors shall be on the Secured Creditors to which such Parcels are abandoned, and such payment shall not be made by the Disbursing Agent or the Reorganized Debtor or out of any of the Estate Auction proceeds or out of the Estate Auction Holdbacks.  For each Parcel that is sold pursuant to the Estate Auction, as such Parcel which secures its respective portion of the Class 9 Allowed Secured Claims of Weber County is sold, the Disbursing Agent at the request of the Reorganized Debtor Subcommittee will pay the Weber County Allowed Secured Claim attributable to the Parcel that is sold from the Net Proceeds for such Parcel as one of the Estate Auction Holdbacks.  Payment shall be made from such holdback by the Disbursing Agent at the request of the Reorganized Debtor Subcommittee on the Weber County Allowed Secured Claim for each Parcel immediately upon the closing of the sale of such Parcel.

4.10    ***Class 10 — Secured Claim of the Weber Basin Water Conservancy District***

(a)    <u>Classification.</u>  The Class 10 Claim consists of the Allowed Secured Claim of the Weber Basin Water Conservancy District ("Weber Conservancy District").

(b)    <u>Treatment.</u>  Weber Conservancy District, the holder of the Allowed Secured Claim of this Class, shall receive the following treatment:

(1)    Allowance of Weber Conservancy District Secured Claim.  The
Weber Conservancy District Secured Claim shall be Allowed in the amount of $55,376.92, the
amount asserted in the Weber Conservancy District's Proof of Claim.

(2)    Abandonment of the Weber Conservancy District Collateral.  The
Weber Conservancy District Collateral shall be abandoned by the Reorganized Debtor to Weber
Conservancy District on the day after the Effective Date, and this shall be accomplished by the
Reorganized Debtor Subcommittee delivering to Weber Conservancy District or to Weber
Conservancy District's Nominee a Quitclaim Deed to the Weber Conservancy District Collateral.
The Quitclaim Deed shall expressly state the following:  (i) the Weber Conservancy District
Collateral is being conveyed to Weber Conservancy District or to Weber Conservancy District's
Nominee subject to all existing Liens of record, including without limitation the Liens of Weber
County on the Weber Conservancy District Collateral, (ii) there shall be no merger of title
between Weber Conservancy District's Liens, which will remain in effect and are not terminated
under this Plan, and ownership of Weber Conservancy District Collateral, and (iii) Weber
Conservancy District is entitled to foreclose its preserved Liens against the Weber Conservancy
District Collateral.

Within three months of the delivery of the Quitclaim Deed to Weber
Conservancy District or Weber Conservancy District's Nominee, if Weber Conservancy District
claims that the Weber Conservancy District Collateral Value is not equal to the amount of the
Weber Conservancy District Allowed Secured Claim and that Weber Conservancy District is
entitled to an unsecured deficiency claim, Weber Conservancy District shall file an adversary
proceeding in the Bankruptcy Court asserting the amount of its deficiency claim, and the
Bankruptcy Court shall determine the amount of Weber Conservancy District's deficiency claim
by applying deficiency rules consistent with the deficiency rules in Utah Code Ann. Section 57-
1-32 (including the provisions in that Section for the award of costs and reasonable attorney fees
to the prevailing party) and other applicable Utah law for the assertion of a deficiency claim
following a foreclosure sale.  The amount of Weber Conservancy District's deficiency claim as
determined by a Final Order shall be an Allowed Unsecured Claim under Class 13.  If Weber
Conservancy District does not file such adversary proceeding within the three months deadline,
the Weber Conservancy District Allowed Secured Claim shall be deemed to have been satisfied
in full by the abandonment of the Weber Conservancy District Collateral, and Weber
Conservancy District shall be barred from asserting any deficiency claim or any Allowed
Unsecured Claim under Class 13.  The Reorganized Debtor reserves its right to assert a Section
506(c) Claim against Weber Conservancy District.

4.11    *Class 11 — Secured Claims of Ford Credit.*

(a)    Classification.  The Class 11 Claim consists of the Allowed Secured
Claims of Ford Credit ("Ford Credit").

(b)    Treatment.  Ford Credit, the holder of the Allowed Secured Claims of this
Class, shall receive the following treatment:

(1)    <u>Retention of Liens.</u>  Ford Credit shall retain all prepetition Liens securing the Allowed Secured Claims of this Class having the same rights and priorities accorded to such Liens as of the Petition Date.  The Reorganized Debtor Subcommittee shall have the right to sell the Ford Credit Collateral free and clear of the Ford Credit Liens under the circumstances outlined below, with such Liens to attach to the Net Proceeds from the sale of the Ford Credit Collateral as more fully outlined below.

(2)    <u>Disposition of Ford Credit Collateral.</u>  The Ford Credit Collateral will not be sold at the Estate Auction, but will be disposed of by the Reorganized Debtor separately.  Within five (5) Business Days after the Estate Auction, the Reorganized Debtor Subcommittee shall propose to sell the Ford Credit Collateral to any of the successful bidders at the Estate Auction for an amount equal to at least the current balance of the Ford Credit debt, or for any lesser amount that is agreed to between the Reorganized Debtor Subcommittee and the holder of the Ford Credit Secured Claim, and the payment by the Disbursing Agent at the request of the Reorganized Debtor Subcommittee of any such lesser amount to the holder of the Ford Credit Secured Claim will be in full satisfaction of all claims of Ford Credit, with no deficiency rights.  If a successful bidder at the Estate Auction does not agree to purchase the Ford Credit Collateral, the Ford Credit Collateral will be immediately thereafter either be sold by the Reorganized Debtor if the Ford Credit Collateral can be sold for an amount in excess of the current balance of the Ford Credit debt or abandoned by the Reorganized Debtor to Ford Credit. If Ford Credit believes that it has any deficiency claims after any abandonment of the Ford Credit Collateral, Ford Credit shall file with the Reorganized Debtor Subcommittee an amended proof of claim within thirty (30) calendar days of the abandonment of the Ford Credit Collateral. If the Reorganized Debtor Subcommittee does not agree with Ford Credit's calculation of its deficiency claims, the Reorganized Debtor shall file an objection to Ford Credit's amended proof of claim, and Ford Credit's asserted deficiency claims shall be determined by a Final Order of the Bankruptcy Court.  If Ford Credit does not file its amended proof of claim within the deadline outlined above, the Ford Credit Claims against the Debtor shall be deemed to have been satisfied in full, and Ford Credit shall be barred from asserting any deficiency claims or any Allowed Unsecured Claim under Class 13.

4.12    ***Class 12 — Alleged Secured Claims of Suzanne Roberts, SCR Investments, Inc., Estate of Steven Roberts, and Roberts Living Trust.***

(a)    <u>Classification.</u>  The Class 12 Claim consists of the alleged secured Claims of Suzanne Roberts, SCR Investments, Inc., the Estate of Steven Roberts, and the Roberts Living Trust (collectively the "Roberts Group").

(b)    <u>Treatment.</u>  The Roberts Group holds contingent, unliquidated, duplicative, and disputed Claims against the Debtor, based upon indemnification claims against the Debtor arising from guarantees of loans made to the Debtor by America First, the Farm Bureau, and possibly Zions Bank.  The Roberts Group holds two trust deed liens on some of the Parcels of the Debtor's real estate that are part of the America First Collateral and the Farm Bureau Collateral.  Unless the holders of the Claims of this Class establish, on or before the Confirmation Date, that there is some economic value to these holders' two trust deed Liens asserted against these Parcels, after taking into consideration the senior liens of Weber County

48

and America First, all of the alleged secured Claims of this Class will be disallowed under 11 U.S.C. §506(a).  The Debtor and/or the Committee and/or the Reorganized Debtor shall file objections to any portion of these Claims that are asserted as Unsecured Claims based, in part, on 11 U.S.C. §502(e).  The Debtor and/or the Committee and/or the Reorganized Debtor may also seek subordination of these Claims under 11 U.S.C. §510, and may assert any available Avoidance Actions against any or all of the Roberts Group.  The entire Allowed amount of the Claims of this Class (if there is any Allowed amount and if the Claims are not subordinated) shall be treated as General Unsecured Claims.

### 4.13   *Class 13 — Unsecured Claims*

(a)      <u>Classification.</u>  Class 13 consists of all General Unsecured Claims.

(b)      <u>Treatment.</u>  Unless otherwise agreed by the Reorganized Debtor Subcommittee and the holder of a specific Claim in this Class as to a less favorable treatment, each holder of a General Unsecured Claim that is an Allowed Claim shall receive from the Disbursing Agent at the request of the Reorganized Debtor Subcommittee a Pro Rata Distribution on account of such Claim in accordance with Section 9.3, following the completion of any required Plan payments (if any) to Claims 1 through 12.  In the event that holders of Allowed Claims in this Class receive 100% of their respective Allowed Claims, such holders shall also be paid interest by the Disbursing Agent at the request of the Reorganized Debtor Subcommittee at the Plan Interest Rate (on a Pro Rata Basis) on the amounts of their Allowed Claims from the Petition Date through the date such interest payments are made.

### 4.14   *Class 14 — Equity Interests*

(a)      <u>Classification.</u>  Class 14 consists of all Allowed Equity Interests of the Debtor.

(b)      <u>Treatment.</u>  Each holder of an Allowed Equity Interest shall receive from the Disbursing Agent at the request of the Reorganized Debtor Subcommittee Pro Rata Distributions from Cash remaining in the Estate after payment in full of all Allowed Administrative Expenses, Class 1 Employee Claims, Allowed Priority Tax Claims, Allowed Non-Priority Tax Claims, Allowed Priority Claims, any required Plan payments to the holders of Secured Claims in Classes 3-12, Allowed General Unsecured Claims in Class 13 (plus interest on such Claims at the Plan Interest Rate from and after the Effective Date until such Allowed General Unsecured Claims are paid in full), and Post-Effective Date Claims, on account of their Allowed Equity Interests in accordance with the rights, preferences and privileges of such Allowed Equity Interests.

## ARTICLE V.

## IDENTIFICATION OF CLAIMS AND EQUITY INTERESTS IMPAIRED AND NOT IMPAIRED BY THE PLAN

### 5.1 *Impaired and Unimpaired Classes.*

Claims in Classes 1 and 2 are not impaired under the Plan. Claims and Equity Interests in Classes 3 through 14 are impaired under the Plan.

### 5.2 *Controversy Concerning Impairment.*

In the event of a controversy as to whether any Class of Claims or Equity Interests is impaired under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy.

## ARTICLE VI.

## ACCEPTANCE OR REJECTION OF PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS

### 6.1 *Impaired Classes to Vote on Plan*.

Each holder of a Claim or Equity Interest in an impaired Class, not otherwise deemed to have rejected the Plan, shall be entitled to vote separately to accept or reject the Plan. The Claims and Equity Interests included in Classes 3 through 14 are impaired, and therefore, are entitled to vote to accept or reject the Plan.  The holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if (a) such Person fails timely to object to the proposed alteration, amendment or modification, or (b) in the event an objection is timely filed, the Court determines the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder. The Debtor and the Committee may correct any defect or omission in this Plan and any Plan Agreement without notice to holders of Claims insofar as it does not materially and adversely affect the interests of any such holders.

### 6.2 *Acceptance by Class of Creditors and Holders of Equity Interests.*

An Impaired Class of holders of Claims shall have accepted the Plan if the Plan is accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class that have voted to accept or reject the Plan.  An Impaired Class of holders of Equity Interests shall have accepted the Plan if the Plan is accepted by at least two-thirds (2/3) in amount of the Allowed Equity Interests of such Class that have voted to accept or reject the Plan.  Further, pursuant to *In re Ruti-Sweetwater, Inc.*, 836 F.2d 1263 (10th Cir. 1988), an Impaired Class of holders of Claims or Equity Interests shall be deemed to have accepted the Plan if no votes are cast against the Plan by any holder of a Claim or Equity Interest in the particular Class in question.

6.3    *Cramdown*.

In the event that any Impaired Class of Claims or Equity Interests fails to accept the Plan in accordance with Section 1129(a) of the Bankruptcy Code, the Debtor and the Committee reserve the right to request that the Bankruptcy Court confirm the Plan in accordance with Section 1129(b) of the Bankruptcy Code.

# ARTICLE VII.

# MEANS FOR IMPLEMENTATION

## 7.1    Implementation of the Plan.

The Plan shall be implemented through the means contemplated by Sections 1123(a)(5), (b)(3) and (b)(4) of the Bankruptcy Code: (a) prior to the Effective Date, by the Debtor and the Committee acting jointly, and (b) on and after the Effective Date, by the Reorganized Debtor Subcommittee.  Pursuant to the Confirmation Order, the Debtor and the Committee acting jointly or the Reorganized Debtor Subcommittee, as applicable, may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan; provided, that the Disbursing Agent will hold all post-Effective Date funds of the Reorganized Debtor and will make, as requested by the Reorganized Debtor Subcommittee, all Distributions contemplated by this Plan.  Without limiting the foregoing, such transactions may include:  (i) the execution and delivery of appropriate agreements or other documents of reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (iii) the filing of appropriate certificates with the appropriate governmental authorities pursuant to applicable law; and (iv) all other actions the Debtor and the Committee, acting jointly, and the Reorganized Debtor Subcommittee, as applicable, determine are necessary or appropriate.

## 7.2    Further Implementation of the Plan.

The Plan will further be implemented as follows:

(a)    On the Effective Date, all assets of the Estate shall vest in the Reorganized Debtor and shall be subject to the management, control and custody of the Reorganized Debtor Subcommittee pursuant to the terms of this Plan; provided, that the Disbursing Agent will hold all post-Effective Date funds of the Reorganized Debtor and will make, as requested by the Reorganized Debtor Subcommittee, all Distributions contemplated by this Plan.  The Reorganized Debtor Subcommittee on behalf of the Reorganized Debtor shall be appointed to oversee and manage all assets of the Estate, including but not limited to all Causes of Action and Retained Claims and Defenses, and the Reorganized Debtor Subcommittee shall pursue any such Causes of Action and Retained Claims and Defenses as the representative of the Estate.  Except as otherwise provided in this Plan and the Confirmation Order, and without prior or further

authorization of the Bankruptcy Court, the Reorganized Debtor Subcommittee shall possess all rights and powers possessed by a trustee appointed under the Bankruptcy Code.

(b)     Under this Plan, the Reorganized Debtor Subcommittee is appointed, authorized and directed to liquidate all remaining assets of the Estate for the benefit of the Estate and Creditors and otherwise administer the Reorganized Debtor in all aspects (except for the final windup of the Reorganized Debtor as an entity, which final windup will be conducted by the Reorganized Debtor Board of Managers and not the Reorganized Debtor Subcommittee); request the Disbursing Agent to make prompt Distributions, and, in some cases final Distributions, to holders of Allowed Claims as of the Effective Date and thereafter as set forth in Article IX hereof; request the Disbursing Agent to make expenditures consistent with the Budget for the limited post-Confirmation operations of the Reorganized Debtor; establish reasonable Cash reserves for Disputed Claims and for the Budget expenses incurred in administering the Estate after the Confirmation Date; and arrange for the running of the Estate's business while planning for the Estate Auction and all other actions necessary for the liquidation and collection of non-Cash assets of the Estate, including the commencement, continuation and/or settlement of the Causes of Action and Retained Claims and Defenses for the benefit of the Estate and Creditors.

(c)     During the short period of time between the Effective Date and the Estate Auction, the Reorganized Debtor will conduct only such business activities of the Debtor as are necessary to preserve the going concern value of the Estate's assets consistent with the Budget. All real estate development activities that were previously conducted by the Debtor, acting in its capacity as a developer, will immediately cease. The Reorganized Debtor Subcommittee shall obtain the services of the Estate Auctioneer and possibly other third party brokers to prepare for the Estate Auction, and the Estate Auctioneer will conduct the Estate Auction. If for any reason there is an unanticipated delay in the confirmation of this Plan that prevents the post-Confirmation Estate Auction from occurring on or shortly after June 1, 2012 as anticipated, but the Bankruptcy Court has approved the pre-Effective Date sale of the Estate's assets under Section 363 of the Bankruptcy Code, and such Section 363 sale occurs prior to the Effective Date, such Section 363 sale shall be deemed to be the Estate Auction under this Plan, and all provisions of this Plan relating to the Estate Auction shall apply instead to the Section 363 sale.

(d)     Some of the personal property assets that are currently being used for the operations of the Resort are owned by Wolf Mountain, Inc., the Debtor's subsidiary. Wolf Mountain, Inc. consents to the sale of its personal property assets at the Estate Auction. A portion of the amount allocated to the sale of the Unencumbered Assets from the Estate Auction will be set aside for Wolf Mountain, Inc. Wolf Mountain, Inc., under the direction of the Reorganized Debtor Subcommittee, will satisfy all of its liabilities and then distribute to the Disbursing Agent on behalf of the Reorganized Debtor all of its remaining funds after satisfying its liabilities.

(e)     The Disbursing Agent at the request of the Reorganized Debtor Subcommittee will be authorized to deduct and pay from the Gross Proceeds realized at the Estate Auction the following four holdbacks: (1) a holdback equal to the expenses incurred in order to close the sale of any such real or personal property of the Estate, including payment of

fees and/or commissions for the Estate Auctioneer and/or other independent sales brokers (not to exceed 6% of the Gross Proceeds) and payment of normal and customary closing costs and title insurance premiums and fees and costs; (2) a holdback equal to the amount of the U.S. Trustee's Distribution Fee that will be payable to the U.S. Trustee as a result of the distribution to each Secured Creditor of its share of the proceeds of the Estate Auction; (3) a holdback equal to the amount of all of the Weber County Secured Claims for each Parcel of the Estate's real property that is sold at the Estate Auction, which holdback will be used by the Disbursing Agent at the request of the Reorganized Debtor Subcommittee to immediately pay all of the Weber County Secured Claims against such Parcel; and (4) a holdback of five percent (5%) of the amount of the Gross Proceeds (which 5% holdback will be deemed to be different and distinct from a Section 506(c) Claim, and which 5% holdback will be used for the purposes identified in the definition in Article I of this Plan for "Estate Auction Holdbacks").

(f)     All Estate Auction proceeds from the sale of the Reorganized Debtor's assets, minus the Estate Auction Holdbacks, shall be placed into the Plan Disbursement Account or the Reserve Account.  As soon as practicable after the completion of the sale of all of the Debtor's Assets and the resolution of all Claims disputes and the resolution of the Interpleader Proceeding (if filed), the Disbursing Agent at the request of the Reorganized Debtor Subcommittee shall distribute the remaining proceeds in the Plan Disbursement Account in accordance with the provisions of this Plan.

(g)     The Reorganized Debtor Subcommittee shall have all the powers and duties set forth in this Plan, the Plan Agreements, and under applicable law.  The Reorganized Debtor Subcommittee shall become, on the Effective Date of the Plan, the representative of the Estate under Sections 1123(b)(3) and 1129(a)(5) of the Bankruptcy Code.  On and after the Effective Date, the Reorganized Debtor Subcommittee shall retain and may enforce any and all Causes of Action and Retained Claims and Defenses.

(h)     To the extent that the Reorganized Debtor Subcommittee does not wish to administer an asset, and the disposition of such asset is not otherwise covered by the provisions of this Plan, then pursuant to a final order of the Bankruptcy Court following notice and opportunity for hearing provided to Debtor's counsel and Creditors, the Reorganized Debtor Subcommittee shall be entitled to abandon the asset.  The Reorganized Debtor Subcommittee shall have no personal liability for assets abandoned in accordance with the foregoing procedure, and neither the Estate nor the Reorganized Debtor Subcommittee shall have any liability or responsibility for further administering such abandoned assets or for any Claims attributable to such abandoned assets.

(i)     The Reorganized Debtor Subcommittee shall manage the Estate in a manner consistent with its sound business judgment.  The Reorganized Debtor Subcommittee shall make itself reasonably available to address any questions or concerns by Creditors as to the Estate's administration.  The Reorganized Debtor Subcommittee will also file and serve on the Debtor's Counsel and to Creditors who have requested such reports the Post-Confirmation Quarterly Reports required by the Office of the U.S. Trustee.

(j)     After the Effective Date, the Reorganized Debtor Subcommittee may employ, engage the services of, and compensate other Persons and professionals (which may include professionals previously or concurrently employed by the Committee or previously employed by the Debtor) that are reasonably necessary to assist the Reorganized Debtor Subcommittee in performing its duties under this Plan, without the necessity of further authorizations by the Bankruptcy Court.  The Reorganized Debtor Subcommittee shall also have right to engage, employ and/or retain any current employees, agents or representatives of the Debtor if the Reorganized Debtor Subcommittee deems their services as reasonably necessary to assist the Reorganized Debtor Subcommittee in performing its duties under this Plan.  The Reorganized Debtor Subcommittee will also be authorized to compensate the Disbursing Agent at his or her regular hourly rate for the type of disbursement activities contemplated by this Plan as well as to reimburse the Disbursing Agent for the costs of the defalcation bond (the "Bond") that the Disbursing Agent obtains to protect the Reorganized Debtor in connection with the Reorganized Debtor's funds that the Disbursing Agent holds and disburses under this Plan.  The Disbursing Agent will obtain a Bond for $3 million of coverage.  If the funds that the Disbursing Agent is holding at any time is greater than $2,400,000, then the Disbursing Agent will increase the coverage under the Bond so that at all times the Bond covers an amount that is at least 125% of the amount of the Reorganized Debtor's funds that the Disbursing Agent is holding.  The Disbursing Agent will not be required to obtain coverage under the Bond for funds paid in connection with the Estate Auction that are disbursed by a title company or bank or other source of payment directly to a Secured Creditor and that are never in the possession or control of the Disbursing Agent.  The Reorganized Debtor Subcommittee will not be holding any of the Reorganized Debtor's funds under this Plan, and therefore will not be required to obtain a separate defalcation bond.

(k)     The Plan Agreements, and all rights, remedies, duties, compromises and obligations embodied therein, are essential to and constitute a material and integral part of this Plan; accordingly, the Plan Agreements are hereby incorporated into this Plan in their entirety by this reference as if set forth in full.  The final versions of all Plan Agreements shall be filed by the Exhibit Filing Date.  Any Plan Agreement may be modified, or amended before or after the Effective Date, if the modification is consented to by the Debtor and the Committee and all the parties to such Plan Agreement, so long as the Bankruptcy Court, after the notice set forth in Article XI hereof, determines that the modification or amendment does not materially and adversely affect the rights of any Class of Claims or Equity Interests under the Plan.

(l)     Pursuant to the Bankruptcy Code and the Confirmed Plan, the Reorganized Debtor Subcommittee shall be authorized to put into effect and carry out the terms of the Plan and any order of the Bankruptcy Court entered in the Case, without further action by the Debtor's previous managers and/or members.  After the Reorganized Debtor Subcommittee has completed its responsibilities under this Plan, the Reorganized Debtor Board of Managers shall be authorized to formally wind up the limited liability company affairs of the Reorganized Debtor and dissolve the Reorganized Debtor.  After the Effective Date, the Reorganized Debtor Subcommittee may, if it so chooses, retain Debtor's Counsel or Committee Counsel or Committee's Accountants to represent the Reorganized Debtor Subcommittee, without the need for any approval from the Bankruptcy Court.

(m)     As soon as practicable following the Effective Date, to the extent not otherwise accomplished prior to the Effective Date, a Plan Agreement shall specify whether the Reorganized Debtor Subcommittee shall terminate, discontinue, transfer or otherwise modify any existing Employee Benefit Programs of the Reorganized Debtor pursuant to the respective terms of such programs and applicable nonbankruptcy law.  All rights are reserved to assert that the agreements underlying any of the Employee Benefit Programs constitute executory contracts which may be rejected pursuant to Article X of this Plan.  Any amounts recovered, realized or refunded upon the termination or other cessation of the Employee Benefit Programs, shall be distributed under the Plan Agreement according to the responsibilities undertaken by the Reorganized Debtor for an Employee Benefit Program following the Effective Date.  It shall be the responsibility of the Reorganized Debtor Subcommittee to have a final audit conducted of the Debtor's 401(k) plan, if such exists.  It shall also be the responsibility of the Reorganized Debtor Subcommittee to ensure the proper filing of all necessary accounting and tax forms with all appropriate state and federal agencies, including, without limitation, federal and state income tax returns, and to otherwise comply with all government requirements relating to any existing Employee Benefit Programs of the Reorganized Debtor.

### 7.3    **Preservation of Causes of Action and Retained Claims and Defenses.**

In accordance with Section 1123(b)(3) of the Bankruptcy Code, and except as otherwise provided in the Plan, all Causes of Action as well as all Retained Claims and Defenses transferred to the Reorganized Debtor shall be retained by the Reorganized Debtor Subcommittee, and the Reorganized Debtor Subcommittee is hereby appointed as the representative of the Estate and shall have the power and authority to prosecute and defend all such Causes of Action and Retained Claims and Defenses for the benefit of the Estate.

### 7.4    **Compromise and Settlement.**

Pursuant to Section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019(a), the Reorganized Debtor Subcommittee may, subject to approval of the Bankruptcy Court, compromise and settle Claims against the Reorganized Debtor or any Claims the Reorganized Debtor or the Estate may have against other Persons.  The Debtor and the Committee shall have the right, with approval of the Bankruptcy Court, to jointly compromise and settle Claims against the Debtor or Claims the Debtor or the Estate may have against other Persons up to and including the Effective Date.  On the Effective Date, such rights shall pass to the Reorganized Debtor Subcommittee, and thereafter, Claims against the Reorganized Debtor or Claims the Reorganized Debtor or the Estate may have against other Persons may be compromised and settled exclusively by the Reorganized Debtor Subcommittee on behalf of the Reorganized Debtor without the need for the approval of the Bankruptcy Court; provided, however, that approval of the Bankruptcy Court, on appropriate application, shall be required for any such compromise or settlement (a) with any "insider" of the Reorganized Debtor, as such term is defined in Section 101(31) of the Bankruptcy Code, or (b) where the amount of the proposed compromise or settlement is in excess of $100,000.

7.5     **LLC Existence and Structure of the Reorganized Debtor.**

       The Debtor, as the Reorganized Debtor, shall continue to exist after the Effective Date in accordance with applicable Utah law and its articles of organization, operating agreement and other organizational documents in effect immediately prior to the Effective Date, except to the extent such organizational documents are amended or deemed amended pursuant to this Plan to be consistent with the terms of this Plan.  On the Effective Date, or as soon thereafter as is practical, the operating agreement of the Debtor shall be amended or deemed amended as necessary to satisfy the provisions of this Plan and the Bankruptcy Code, including, without limitation, the prohibition against the issuance of non-voting equity securities set forth in Section 1123(a)(6) of the Bankruptcy Code.  After the Effective Date, the Reorganized Debtor's organizational documents shall be subject to such further amendments or modifications as may be required by law.  Each of the matters provided for by the Plan involving the limited liability company structure of the Reorganized Debtor or limited liability company or related actions to be taken by or required of the Reorganized Debtor shall, as of the Effective Date, be deemed to have occurred and be effective as provided in the Plan (except to the extent otherwise indicated), and shall be authorized, approved and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by members, creditors, or managers of the Reorganized Debtor.  Without limiting the foregoing, such actions may include:  the adoption and filing of amendments to the Reorganized Debtor's articles of organization or operating agreement; and the appointment of the Reorganized Debtor Board of Managers and the creation of the Reorganized Debtor Subcommittee.

7.6     **Terms of Injunctions or Stays.**

       Unless otherwise provided herein, all injunctions or stays provided for in the Case pursuant to Sections 105 or 362 of the Bankruptcy Code or otherwise in effect on the Confirmation Date shall remain in full force and effect until the Effective Date.  If the Plan is not confirmed, all such injunctions or stays shall remain in full force and effect until ordered otherwise by the Bankruptcy Court or until an alternative plan of reorganization is confirmed in the Case or the Case is dismissed.  Except as may be determined otherwise by Final Order of the Bankruptcy Court, all distributions and transfers of property pursuant to the Plan shall be made free and clear of all liens, claims and encumbrances and, on the Confirmation Date, all holders of Claims or Interests shall be permanently enjoined from and restrained against commencing or continuing any suit, action or proceeding against the Reorganized Debtor, or asserting against the Reorganized Debtor or the assets or property thereof, any claim, interest or cause of action based upon any act or omission, transaction or other activity of any kind that occurred prior to Confirmation.

7.7     **Further Assurances.**

       On the Effective Date or as soon as reasonably practical thereafter, the Reorganized Debtor Subcommittee is authorized to and may issue, execute, deliver, file or record all documents and such other contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan in the name of and on behalf of the

Reorganized Debtor, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan.

### 7.8 **Effects of Appeal.**

Unless the Confirmation Order is stayed pending a timely appeal therefrom, at the option of the Debtor and the Committee, the Plan may be consummated notwithstanding the pendency of an appeal from the Confirmation Order or the timely service or filing of a motion under Bankruptcy Rules 7052, 8002, 8003, 8015, 9023 or 9024.

### 7.9 **Exemption from Certain Transfer Taxes and Recording Fees.**

Pursuant to Section 1146(c) of the Bankruptcy Code, any transfer from the Debtor to the Reorganized Debtor pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (i) the issuance, transfer, or exchange of any debt, equity security, or other interests in the Debtor or the Reorganized Debtor; (ii) creation, modification, consolidation, or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (iii) the making, assignment, or recording of any lease or sublease; or (iv) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and this Plan and/or the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 7.10 **Termination of Committee.**

The Committee shall be dissolved and its members discharged upon the Effective Date or as soon as practicable thereafter.  All remaining fees and expenses of the professionals retained by the Committee shall be paid in full or otherwise disallowed by Final Order of the Bankruptcy Court, whether before or after the Effective Date, without regard to any prior termination of the Committee.

## ARTICLE VIII.

## THE REORGANIZED DEBTOR SUBCOMMITTEE AND THE REORGANIZED DEBTOR BOARD OF MANAGERS

### 8.1 **Reconstituted Board of Managers for the Reorganized Debtor and Creation of the Reorganized Debtor Subcommittee.**

(a)     The Debtor is currently being managed by the following members of its Board of Managers:  Peter Bohlinger, Parley Baldwin, Lowell Peterson, and Rob Thomas.

(b)     The current members of the Committee are:  (1) RLR Properties of Portland, Oregon, Chair, represented by Ron Rubin, Chairperson; (2) Wolf Creek Recreational Facilities Association, Inc. of Redmond, Washington, represented by Robert T. Coffin; and (3) Strategic Marketing Group, Inc. of Park City, Utah, represented by Melisa Miller.

(c)     On the Effective Date, notwithstanding anything to the contrary in the documents and filings governing the Debtor as a limited liability company, the Board of Managers for the Reorganized Debtor shall be reconstituted into the Reorganized Debtor Board of Managers, which shall consist of the four current members of the Debtor's Board of Managers and the representatives of the three current members of the Committee, or such lesser numbers of the current members of the Committee that desire to serve in such capacity.

(d)     On the Effective Date, notwithstanding anything to the contrary in the documents and filings governing the Debtor as a limited liability company, a new Reorganized Debtor Subcommittee (which is a subcommittee of the Reorganized Debtor Board of Managers) of no less than three and no more than five persons shall come into existence.  The following Persons are the current Reorganized Debtor Subcommittee Members, who shall serve through the following representatives, or the alternates designated by each Reorganized Debtor Subcommittee Member (if any), as outlined below:

| Reorganized Debtor Subcommittee Member | Representative | Alternate |
|---|---|---|
| RLR Properties – Chair | Ron Rubin – Chair | _____ |
| Wolf Creek Recreational Facilities Association, Inc. | Robert T. Coffin | _____ |
| Strategic Marketing Group, Inc. | Melisa Miller | _____ |
| _____ | Lowell Peterson | _____ |
| _____ | Rob Thomas | _____ |

(e)     Each of the foregoing Reorganized Debtor Subcommittee Members and their representatives and (where applicable) their alternate representatives have agreed to serve, and such representatives shall attend and participate in Reorganized Debtor Subcommittee meetings, shall vote for the Reorganized Debtor Subcommittee Member for which they are the representative, and shall exercise all of the Reorganized Debtor Subcommittee Member's rights and powers.  RLR Properties, through its representative Ron Rubin, shall be the Chair of the Reorganized Debtor Subcommittee.  Members of the Reorganized Debtor Subcommittee may attend meetings by telephonic means, and personal attendance shall not be required at such meetings.  In the event that, for whatever reason, the membership of the Reorganized Debtor Subcommittee is only 4 members, and if there is any vote of the Reorganized Debtor

Subcommittee that is a tie vote, then the vote of the Chair of the Reorganized Debtor Subcommittee will be the tie-breaker for that vote.

(f)    A Reorganized Debtor Subcommittee Member may change its representative or designate an alternate representative by written notice to the Chair of the Reorganized Debtor Subcommittee.  If the representative of a Reorganized Debtor Subcommittee Member anticipates that his or her absence from Reorganized Debtor Subcommittee meetings and other responsibilities will be long term or permanent, and such Reorganized Debtor Subcommittee Member elects not to or cannot designate another individual to be its representative or alternate on the Reorganized Debtor Subcommittee, such Reorganized Debtor Subcommittee Member may designate a successor Reorganized Debtor Subcommittee Member (which in the case of RLR Properties, Wolf Creek Recreational Facilities Association, Inc., and Strategic Marketing Group, Inc., must be another holder of an Allowed Class 13 Unsecured Claim) to take its place on the Reorganized Debtor Subcommittee, and such successor Reorganized Debtor Subcommittee Member shall then designate by written notice to the Chair of the Reorganized Debtor Subcommittee who will be its representative and (if necessary) who will be its alternate representative.  In the event a successor Reorganized Debtor Subcommittee Member is not so designed, the Reorganized Debtor Subcommittee shall be constituted of the remaining members of the Reorganized Debtor Subcommittee, provided, however, that there shall be at least three current members of the Reorganized Debtor Subcommittee in order for the Reorganized Debtor Subcommittee to take action.

(g)    All decisions of and actions by the Reorganized Debtor Subcommittee shall be by majority vote, and all existing representatives or alternate representatives of all of RLR Properties, Wolf Creek Recreational Facilities Association, Inc., and Strategic Marketing Group, Inc. (or their successors) who are then serving on the Subcommittee will need to be present at any meeting of the Reorganized Debtor Subcommittee in order to form a quorum for conducting business.

(h)    The Reorganized Debtor Subcommittee shall have the full responsibility to implement and put into effect and carry out the terms of the Plan and the Confirmation Order and any order of the Bankruptcy Court entered in the Case.

(i)    After the Reorganized Debtor Subcommittee has completed its responsibilities under this Plan, RLR Properties, Wolf Creek Recreational Facilities Association, Inc., and Strategic Marketing Group, Inc. (or their successors) will immediately resign from the Reorganized Debtor Board of Managers (which will not conduct any official business until after the Reorganized Debtor Subcommittee has completed its responsibilities under this Plan), and the Reorganized Debtor Board of Managers shall then be authorized to formally wind up the limited liability company affairs of the Reorganized Debtor and dissolve the Reorganized Debtor.  The Reorganized Debtor Board of Managers as a whole shall have no responsibilities or authority to implement any of the terms of the Plan, other than to formally wind up the affairs of and dissolve the Reorganized Debtor.

59

8.2 **Reimbursement of Out of Pocket Expenses of the Reorganized Debtor Subcommittee Members.**

The representatives of the Reorganized Debtor Subcommittee Members shall serve on the Reorganized Debtor Subcommittee without compensation, but shall be entitled to reimbursement of their reasonable and necessary out of pocket expenses. The Reorganized Debtor Subcommittee Members shall submit their detailed expense invoices to the Chair of the Reorganized Debtor Subcommittee, which invoices shall be paid within thirty (30) days of the submission thereof. If the Chair of the Reorganized Debtor Subcommittee objects to a portion of any expense invoice, the Disbursing Agent at the request of the Reorganized Debtor Subcommittee shall timely pay the undisputed portion of the invoice and shall reserve monies in the amount of the disputed invoice pending resolution of the objection, either by (i) written agreement between the Reorganized Debtor Subcommittee Member submitting the disputed invoice and the Chair of the Reorganized Debtor Subcommittee, or (ii) resolution of the disputed amount by the Bankruptcy Court pursuant to a Final Order.

8.3 **Exculpation; Limitation of Liability.**

(a) All actions by the Reorganized Debtor Subcommittee and their representatives and the Disbursing Agent as contemplated in the Plan or otherwise in the administration of the Case shall be conclusively deemed to be actions within the scope of the Bankruptcy Code. Except as otherwise provided by applicable law, and excluding acts or omissions constituting gross negligence or willful misconduct, the Reorganized Debtor Subcommittee, the Reorganized Debtor Subcommittee Agents, the Reorganized Debtor Subcommittee Members and their representatives, and the Disbursing Agent, shall not be liable to any Person for any act taken or omitted by any of them in good faith and in compliance with the applicable provisions of the Code or pursuant to the discretion, power, and authority conferred by this Plan, the Plan Agreements, or Court Orders. The Reorganized Debtor Subcommittee Members and their representatives and the Disbursing Agent shall not be liable to any individual Creditor, and shall be liable only to the Estate, for acts or omissions related to performance of their duties for the Estate that constitute willful misconduct or gross negligence. In addition, except as provided under applicable law, neither the Reorganized Debtor Subcommittee nor any of the Reorganized Debtor Subcommittee Members or their representatives nor the Disbursing Agent shall be liable for the acts or omissions of any Person employed by the Reorganized Debtor Subcommittee or the Committee or the Debtor, any other Creditor, or any of the Debtor's officers, members, managers, board members, employees, agents or professionals. In all respects, the Reorganized Debtor Subcommittee and the Reorganized Debtor Subcommittee Members and their representatives and the Disbursing Agent shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan, and such reliance shall in no event constitute gross negligence or willful misconduct. The Reorganized Debtor Subcommittee shall not be responsible for any obligations or duties of the Debtor or the Reorganized Debtor with respect to limited liability company governance, limited liability company reporting, or provision of information for securities law compliance, except any such duties that are expressly delegated to the Reorganized Debtor Subcommittee in this Plan.

8.4   **Injunction.**

The exculpation and limitation of liability provisions pursuant to the preceding Section hereof shall act as an injunction against the commencement or continuation of any action, employment of process or act to collect, offset or recover any Claim or Cause of Action so satisfied and released to the fullest extent permitted under the Bankruptcy Code.

8.5   **Indemnification of Reorganized Debtor Subcommittee Members and Disbursing Agent.**

Each of the Reorganized Debtor Subcommittee Members and their representatives and the Disbursing Agent shall be defended, held harmless, and indemnified by the Estate against any and all losses, claims, costs, expenses, and liabilities (including legal fees and expenses) asserted against them by any Person other than the Estate and any costs of defending any action brought by any Person other than the Estate to which the Reorganized Debtor Subcommittee Members and their representatives or the Disbursing Agent may be subject by reason of their execution in good faith of their duties under the Plan and the Plan Agreements. This indemnity is intended to be and shall be interpreted as providing indemnity to the fullest extent permissible under Utah law.  Further, each of the Reorganized Debtor Subcommittee Members shall be added as additional insureds under the Debtor's director's and officer's liability policies.

8.6   **Employment of Agents.**

The Reorganized Debtor Subcommittee may select and employ professionals, the Estate Auctioneer, brokers, banks, custodians, investment advisors, and agents on behalf of the Estate ("Reorganized Debtor Subcommittee Agents").  The Reorganized Debtor Subcommittee may employ such Reorganized Debtor Subcommittee Agents without regard to the prior or concurrent employment of any such Reorganized Debtor Subcommittee Agent by any Creditor, the Committee, or the Debtor.  The Reorganized Debtor Subcommittee may request the Disbursing Agent to pay the salaries, fees, and expenses of the Reorganized Debtor Subcommittee Agents out of the Estate's assets without notice to or the approval of the Bankruptcy Court, the U.S. Trustee, the Debtor or any Creditor.  Each Reorganized Debtor Subcommittee Agent shall be paid by the Disbursing Agent at the request of the Reorganized Debtor Subcommittee monthly in arrears, and shall prepare an itemized invoice which shall be sent to the Reorganized Debtor Subcommittee.  On the eleventh (11th) calendar day after the mailing of the invoice, the Reorganized Debtor Subcommittee may request the Disbursing Agent to pay such Reorganized Debtor Subcommittee Agent such compensation and reimbursement of expenses as are consistent with this Plan.  Any Reorganized Debtor Subcommittee Member may object to any invoice, in a writing sent to the chair of the Reorganized Debtor Subcommittee, the other Reorganized Debtor Subcommittee Members, and the Reorganized Debtor Subcommittee Agent who is the subject of the objection.  In the case of an objection, the portion of the fees and expenses that are not subject to the objection shall be paid, and the dispute over the remaining fees and expenses shall be resolved either by agreement by all parties or by order of the Bankruptcy Court.

## ARTICLE IX.

## PROVISIONS GOVERNING DISTRIBUTIONS AND OBJECTIONS

9.1     **Objections to Claims**.

(a)     Claims Objection Deadline.  The dates of October 6, 2010 for non-governmental Claims and December 6, 2010 for governmental Claims were previously set by the Bankruptcy Court as the deadline for filing Proofs of Claim in the Case.  The deadline for filing a request for payment of any Administrative Expense shall be sixty (60) calendar days after the Effective Date of the Plan.  Notwithstanding this deadline, the Internal Revenue Service shall not be obligated to file an Administrative Expense request with respect to which a tax return is required to be filed.  The deadline for objecting to Claims shall be one hundred twenty (120) days from the Effective Date, except: (i) with respect to the Final Fee Applications for pre-Effective Date compensation of professionals, for which the deadline for objections shall be the date fixed under Section 2.1 of this Plan.

(b)     Authority.  The Reorganized Debtor Subcommittee shall be responsible for examining Claims and for filing and resolving objections to Claims in all instances in which objections have not been filed by the Debtor or the Committee prior to the Effective Date and in accordance with other provisions of the Plan.  If a Claim objection or a potential Claim objection or any other matter being examined by the Reorganized Debtor Subcommittee affects any Reorganized Debtor Subcommittee Member such that it would be a conflict of interest for such Reorganized Debtor Subcommittee Member to vote on such item, the representative of that Reorganized Debtor Subcommittee Member shall abstain from voting on that item and shall also recuse himself or herself from any of the deliberations or proceedings of the Reorganized Debtor Subcommittee relating to such conflict of interest item.  As to objections filed by the Debtor prior to the Effective Date but not resolved or determined by the Effective Date, the Reorganized Debtor Committee shall be vested on the Effective Date with all rights, interests, and authority of the Debtor and the Reorganized Debtor.  On and after the Effective Date, the Reorganized Debtor Subcommittee shall have the power to assert and administer all Causes of Action and all Retained Claims and Defenses.  The Reorganized Debtor Subcommittee shall have the right to object to any Claim, and to assert defenses, counterclaims, or subordination against any Claim, irrespective of how the Claim was scheduled.  Except as otherwise provided herein, if the Reorganized Debtor Subcommittee disputes any Claim for which a proof of claim has been filed, the Reorganized Debtor Subcommittee must file and serve on the holder of the Disputed Claim an objection on or before 120 days following the Effective Date (the "Claims Objection Deadline").  The Reorganized Debtor Subcommittee may retain professionals willing to represent the Estate in pursuit of any of the Causes of Action or the Retained Claims and Defenses on a full or partial contingency fee basis or other performance-based compensation arrangement (as opposed to an hourly compensation arrangement), as the Reorganized Debtor Subcommittee may agree with said professionals.

9.2     **Estimation of Disputed Claims.**

(a)     The Reorganized Debtor Subcommittee may, at any time, request that the Bankruptcy Court estimate any Disputed Claim subject to estimation under Section 502(c) of the Bankruptcy Code, including any Disputed Claim for taxes to the extent permitted by Section 502(c) of the Bankruptcy Code, regardless of whether any party in interest previously objected to such Claim, and the Bankruptcy Court shall retain jurisdiction to estimate any Disputed Claim pursuant to Section 502(c) of the Bankruptcy Code at any time during litigation concerning any objection to the Claim.  Disputed Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism set forth in the Plan or approved by the Bankruptcy Court.

9.3     **Methods of Distribution Under the Plan.**

(a)     Manner of Payments Under the Plan.  Cash Distributions shall be made by the Disbursing Agent at the request of the Reorganized Debtor Subcommittee.  The Disbursing Agent shall hold and disburse all post-Effective Date funds under this Plan.

(b)     Distribution of Unclaimed Property.  Except as provided in the Plan, any Distribution of Cash under the Plan which is unclaimed ("Unclaimed Property") shall be deposited by the Disbursing Agent at the request of the Reorganized Debtor Subcommittee into the Disputed Claims Reserve Account to be held for the benefit of the holders of Allowed Claims entitled thereto under the terms of the Plan.  Upon presentation of proper proof by a Creditor entitled to such Unclaimed Property, the Unclaimed Property due the Creditor shall be released by the Disbursing Agent at the request of the Reorganized Debtor Subcommittee from the Disputed Claims Reserve Account and paid to such Creditor.

(c)     Disposition of Unclaimed Property.  Notwithstanding the foregoing, upon the later of six (6) months after the Effective Date or three (3) months after the unclaimed Distribution is initially made, Creditors shall cease to be entitled to the Unclaimed Property in which they previously had an interest, and such Unclaimed Property shall then be transferred by the Disbursing Agent at the request of the Reorganized Debtor Subcommittee to the Plan Disbursement Account and distributed in the same manner as other Cash Distributions, and the Creditor to whom such Unclaimed Property was delivered shall forever be removed as the holder of an Allowed Claim against the Estate.

(d)     Accounts.  After Confirmation and no later than the Effective Date, the Disbursing Agent at the request of the Reorganized Debtor Subcommittee shall promptly establish three (3) or more accounts.  One of the accounts shall be identified as the Plan Disbursement Account, and another shall be identified as the Disputed Claims Reserve Account.  Also, on the Effective Date, and from time to time thereafter as Gross Proceeds are received, the Disbursing Agent at the request of the Reorganized Debtor Subcommittee shall establish and fund a Reserve Account into which Cash shall be on deposit sufficient to fund the Budget.  On the Effective Date, the Disbursing Agent at the request of the Reorganized Debtor Subcommittee shall allocate Cash on Hand among these accounts in such amounts as is necessary to make the

first Distributions required in Sections (a)(1) and (a)(2) below and thereafter, if Cash is available, to make the Distributions required in Sections (b)(1), (b)(2) and (c) below.

(1)     Initial Distribution – Allowed Administrative Expenses, Allowed Non-Tax Priority Claims, and Allowed Claims in Class 1.  On the Effective Date, the Disbursing Agent at the request of the Reorganized Debtor Subcommittee shall transfer a portion of the Cash on hand to the Plan Disbursement Account in an amount sufficient to satisfy (i) all Allowed Administrative Expenses, (ii) all Allowed Non-Tax Priority Claims, and (iii) all Allowed Claims (if any) in Class 1.  Said Allowed Administrative Expenses and Allowed Non-Tax Priority Claims and Allowed Class 1 Claims (if any) shall be paid by the Disbursing Agent at the request of the Reorganized Debtor Subcommittee from the Plan Disbursement Account on the Effective Date, and consistent with the Plan.

(2)     Disputed Claims Reserve.  On the Effective Date and from time-to-time as further Distributions are made, the Disbursing Agent at the request of the Reorganized Debtor Subcommittee shall deposit into the Disputed Claims Reserve Account Distributions for any Disputed Administrative Expenses and Disputed Non-Tax Priority Claims, or Disputed Claims based on the assumption that all such disputed items will be allowed in full, unless the Bankruptcy Court shall estimate that a smaller reserve is sufficient (the "Disputed Claims Reserve").  Any Creditor whose Claim is so estimated shall have recourse only to the reserve established by the Bankruptcy Court for such Creditor's Disputed Claim, and not to the Reorganized Debtor, the Estate, the Reorganized Debtor Subcommittee, the Disbursing Agent, or any person receiving property or Distributions under the Plan, even if the Allowed Claim of such Creditor exceeds the maximum estimation of such Claim.  **THUS, THE BANKRUPTCY COURT'S ESTIMATION OF A DISPUTED CLAIM WILL LIMIT THE DISTRIBUTION TO BE MADE THEREON, REGARDLESS OF THE AMOUNT FINALLY ALLOWED ON ACCOUNT OF SUCH CLAIM.**  All interest, dividends, and profits earned in the Disputed Claims Reserve Account shall be property of the Estate and shall accrue for the benefit of the Estate, and no holder of any Claim or any Disputed Claim shall have any rights in such interest, dividends, or profits.

(3)     Class 14 Equity Interests Excluded from Disputed Claims Reserve Account.  As set forth in Section 4.15 above, holders of Allowed Equity Interests in Class 14 shall only receive payment if and when all other Allowed Claims, Administrative Expenses, Non-Tax Priority Claims and Post-Effective Date Claims have been paid in full, and interest has been paid to the holders of Allowed General Unsecured Claims.  Therefore, the Disbursing Agent shall not make any deposits into the Disputed Claims Reserve Account for any Disputed Equity Interests.

(e)     Additional Distributions.

(1)     Distributions on Disputed Claims Which Become Allowed Claims. If a Disputed Administrative Expense, Disputed Non-Tax Priority Claim or Disputed Claim becomes an Allowed Claim in whole or in part, then within twenty-one (21) calendar days following the allowance of the Administrative Expense, Non-Tax Priority Claim or Claim by Final Order (or within such extended period, as may be provided by the Plan), the Disbursing

Agent at the request of the Reorganized Debtor Subcommittee shall distribute to the Creditor, out of the Disputed Claims Reserve Account, an amount equal to that which such Creditor would have been entitled if there had not been a dispute as to such Claim at the time of any earlier Distribution, without interest.

(f)     Final Distribution of Cash.  After (i) all Post-Effective Date Claims, Disputed Administrative Expenses, Disputed Non-Tax Priority Claims and Disputed Claims are either Allowed or disallowed pursuant to a Final Order, and (ii) all Post-Effective Date Claims, Allowed Administrative Expenses and Allowed Claims in Classes 1-12 are paid or satisfied in full according to the terms of this Plan, the Reorganized Debtor Subcommittee shall make a final determination of surplus property, taking into account the resolution of Disputed Claims, taxes incurred but not yet paid or expected to be incurred, professional fees and expenses, Distributions previously held as Unclaimed Property, and all interest earned on the Cash maintained in the Disputed Claims Reserve Account.  All such surplus property shall be distributed by the Disbursing Agent at the request of the Reorganized Debtor Subcommittee Pro Rata to holders of Class 13 Allowed General Unsecured Claims according to the terms of Section 4.14 above, until they are paid in full with interest, and thereafter, Pro Rata to holders of Allowed Equity Interest in Class 14 until they are paid in full.  Any Cash received by the Disbursing Agent after the final Distribution shall be distributed by the Disbursing Agent at the request of the Reorganized Debtor Subcommittee pursuant to the Plan; provided, however, that if the expenses of such a Distribution would exceed the amount to be distributed, or if the Distribution to any Creditor would be less than $1.00, the Distribution shall not be made and said Cash shall be donated by the Disbursing Agent to the United States Treasury.

(g)     Investments of Cash.  The Disbursing Agent at the request of the Reorganized Debtor Subcommittee shall invest and deposit Cash only in Allowed Investments. Interest earned on any invested and deposited Cash shall not be payable to any particular Class of Creditor, but shall be held generally as Cash of the Estate.

(h)     Distribution Procedures.  All Distributions made under the Plan shall be made by the Disbursing Agent at the request of the Reorganized Debtor Subcommittee to holders of Allowed Claims (a) if any such holder has filed a proof of claim, at the address of such holder as set forth in the proof of claim, or (b) if any such holder has not filed a proof of claim, at the last known address of such holder according to the Debtor's books and records.  The Reorganized Debtor Subcommittee shall have no obligation to recognize any purported transfer of a Claim after the Effective Date, and will be entitled for all purposes relating to the Plan to recognize and deal only with those holders of Claims shown on the books of the Debtor as of the Effective Date.

9.4     **Setoff Rights.**

(a)     The Reorganized Debtor Subcommittee may, but shall not be required to, set off against or recoup from any Claim and the Distributions to be made by the Disbursing Agent pursuant to the Plan in respect of such Claim, Claims of any nature whatsoever that the Debtor may have against the holder of such Claim; provided that neither the failure to do so nor

the allowance of any Claim hereunder shall constitute a waiver or release of any such Claims against such holder.

(b)       Failure by the Debtor or the Committee to object to or examine any Claim or Interest for purposes of voting in favor of or against the Plan shall not be deemed a waiver of the Debtor's, the Reorganized Debtor Subcommittee's or any other Person's rights to object to, or re-examine, such Claim or Interest, in whole or in part, for purposes of allowance or distribution.

## ARTICLE X.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 10.1    Rejection of Contracts and Leases.

Other than as set forth in this Plan, all executory contracts and unexpired leases that exist between or among the Debtor and any other Person shall be deemed rejected by operation of this Plan pursuant to Section 365(a) of the Bankruptcy Code on the Effective Date, except for any such contract or lease (a) that has been assumed or rejected, or renegotiated and assumed on modified terms, pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (b) that has been entered into by the Debtor during the pendency of the Case in the ordinary course of business or pursuant to an order of the Bankruptcy Court, (c) that is the subject of a motion to assume or reject, or a motion to approve renegotiated terms and to assume or reject on such terms, filed prior to the Effective Date, or (d) that is specifically treated otherwise in this Plan or a Plan Agreement or in the Confirmation Order.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Section 365(a) of the Bankruptcy Code, of the rejection of executory contracts and unexpired leases as provided for herein.

### 10.2    Bar to Rejection Damages.

Claims arising from the rejection of the Debtor's executory contracts or unexpired leases shall be treated as General Unsecured Claims. The holder thereof shall file a proof of claim by the date fixed in such rejection order or, if no deadline is specified in such order, within thirty (30) days of the effective date of the rejection of such contract or lease, or shall be forever barred. Objections to such Claims shall be filed and served by the Claims Objection Deadline.

### 10.3    Assumption of Specific Contracts and Leases.

Notwithstanding anything to the contrary in the Plan, not less than ten (10) days prior to the Confirmation Hearing, the Debtor and the Committee shall provide as one of the Plan Agreements a list of executory contracts and unexpired leases being assumed by operation of the Plan pursuant to Section 365(a) of the Bankruptcy Code.  If the membership agreements for the golf course component of the Resort are assumed under the Plan, the purchaser at the Estate Auction of the Zions Bank Collateral (or Zions Bank if the Zions Bank Collateral is abandoned or otherwise conveyed to Zions Bank) will be responsible under this Plan to honor such

membership agreements.  If the contracts for future events (such as wedding receptions, etc.) on the Farm Bureau Collateral are assumed under the Plan, the purchaser at the Estate Auction of the Farm Bureau Collateral (or the Farm Bureau if the Farm Bureau Collateral is abandoned or otherwise conveyed to the Farm Bureau) shall be responsible under this Plan to honor such contracts.

10.4    **Insurance Policies.**

Notwithstanding anything to the contrary contained in the Plan, the Debtor's insurance policies and any agreements, documents or instruments relating thereto shall be deemed to be and treated as though they are executory contracts, and shall be assumed as of the Effective Date by operation of the Plan pursuant to Sections 365(a) and 1123(b) of the Bankruptcy Code.  Nothing contained herein shall constitute or be deemed a waiver of any Cause of Action or any Retained Claim or Defense against any insurer or any other Person (except as otherwise provided herein) under any of the Debtor's policies of insurance or otherwise, or in any way to limit the obligation of such insurers to defend, indemnify, and/or hold harmless the Debtor under the terms of any insurance policy issued to the Debtor.

10.5    **Cure of Defaults.**

On the Effective Date, the Reorganized Debtor Subcommittee on behalf of the Reorganized Debtor shall (a) cure (through the Disbursing Agent) or provide adequate assurance that the Reorganized Debtor will cure (through the Disbursing Agent) any and all undisputed defaults under any executory contract or unexpired lease assumed pursuant to the Plan and (b) compensate (through the Disbursing Agent) or provide adequate assurance that the Reorganized Debtor Subcommittee (through the Disbursing Agent) will promptly compensate the other parties to such executory contract or unexpired lease for the agreed amount of any actual pecuniary loss to such party resulting from such undisputed default in accordance with Section 365(b)(1) of the Bankruptcy Code.  In the event that the Debtor disputes the existence of a default, or the nature, extent or amount of any required cure, adequate assurance or compensation, the Debtor's and the Reorganized Debtor's obligations under Section 365(b) of the Bankruptcy Code shall be determined by a Final Order, and any such obligations shall be performed by the Reorganized Debtor Subcommittee on behalf of the Reorganized Debtor unless otherwise provided in such Final Order.

## ARTICLE XI.

## POST EFFECTIVE DATE NOTICES TO CREDITORS AND OTHER INTERESTED PARTIES

11.1    **Notices to Creditors and Other Interested Parties**.

(a)    In the event that (i) the Reorganized Debtor Subcommittee proposes to enter into an agreement, settlement, compromise, sale, assignment or adjustment or otherwise take an action on behalf of the Estate, (ii) the Reorganized Debtor Subcommittee requests instructions from the Bankruptcy Court with respect to authority to undertake certain actions or

to refrain from taking actions under this Plan, the Confirmation Order or the Plan Agreements, or (iii) the Reorganized Debtor Subcommittee proposes to modify or amend this Plan or any Plan Agreement, then the Reorganized Debtor Subcommittee shall transmit only to the Debtor's Counsel and to Creditors a written notice summarizing the proposed action, and the recipient of such notice shall have ten (10) calendar days to transmit a written objection thereto.  If a written objection is timely made and the Reorganized Debtor Subcommittee and the objecting party are unable promptly to resolve the dispute, such matter shall be heard and determined by the Bankruptcy Court, subject to availability on the Bankruptcy Court's calendar, upon not less than ten (10) calendar days' notice to the objecting party and the Reorganized Debtor Subcommittee and Debtor's Counsel.  Absent timely objection, a proposed agreement, settlement, compromise, sale, assignment, adjustment, amendment, modification, or other action shall be binding on the Estate and the Reorganized Debtor without the necessity for approval by the Bankruptcy Court; provided, however, the Reorganized Debtor Subcommittee may, in its discretion, seek Bankruptcy Court approval of any matter.

<h2 style="text-align:center">ARTICLE XII.</h2>

<h2 style="text-align:center">EFFECT OF CONFIRMATION</h2>

### 12.1    **No Effect on Criminal, Tax or Environmental Statutes or Laws**.

Nothing in this Plan or in the Confirmation Order releases any entity from any liability to the United States or the State of Utah under any criminal or tax law or any police or regulatory statute enforceable by the United States or the State of Utah, nor shall anything in the Confirmation Order or Plan discharge any Claim of the United States or the State of Utah under any environmental statute or regulation or any law or legal principle prohibiting fraud.

### 12.2    **Deemed Consent**.

By accepting Distributions from the Disbursing Agent under and pursuant to the Plan, each holder of an Allowed Claim receiving Distributions pursuant to the Plan shall be deemed to have specifically consented to the injunctions and exculpations set forth in this Article and otherwise in this Plan.

<h2 style="text-align:center">ARTICLE XIII.</h2>

<h2 style="text-align:center">CONDITIONS PRECEDENT</h2>

### 13.1    **Conditions to Confirmation**.

(a)    Except as expressly waived, the Plan shall be null and void and have no force or effect unless the Court shall have entered the Confirmation Order, which shall be a Final Order and which Confirmation Order shall:

(1)    confirm the Plan without modification except as modified jointly by the Debtor and the Committee in accordance herewith;

(2)    be in form and substance acceptable jointly to the Debtor and the Committee;

(3)    declare that the provisions of the Confirmation Order shall not be severable and are mutually dependent;

(4)    declare that the transfer of the Debtor's assets, including the transfer of ownership of all remaining real property to the Reorganized Debtor shall be free from any and all recordation and transfer taxes; and

(5)    declare that the Debtor and the Committee have solicited acceptances of the Plan in good faith and in compliance with the Bankruptcy Code and that the Debtor and the Committee and each of their affiliates, agents, directors, officers, employees, members, advisors and attorneys have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code, and therefore are not liable for the violation of any applicable law, rule or regulation governing the solicitation of votes on the Plan.

## 13.2    **Conditions to Effective Date.**

Except as expressly waived, a condition precedent to the Effective Date is the entry of the Confirmation Order, in form and substance acceptable jointly to the Debtor and the Committee, and no request for revocation of the Confirmation Order under Section 1144 of the Bankruptcy Code shall have been made, or, if made, shall be pending, provided that, if an appeal of the Confirmation Order or any other such order is filed but no stay is granted in connection therewith, the Debtor and the Committee may jointly elect to permit the Effective Date to occur notwithstanding pendency of appeal.

## 13.3    **Waiver of Conditions.**

All of the conditions precedent for Confirmation may be waived jointly by the Debtor and the Committee without any notice to parties in interest or the Bankruptcy Court and without a hearing, unless waiver is prohibited by law.

## 13.4    **Effect of Failure of Conditions.**

In the event that the conditions for Confirmation have not been satisfied or waived on or before sixty (60) days after the Confirmation Date, then upon written notification filed jointly by the Debtor and the Committee with the Bankruptcy Court: (a) the Confirmation Order shall be vacated, (b) no distributions under the Plan shall be made, (c) the Debtor and the Committee and all holders of Claims and Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and (d) all obligations of the Debtor with respect to the Claims and Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any Claims against the Debtor or any claims of the Debtor against any other Person or to prejudice in any manner the rights of the Debtor or any other Person in any further proceedings involving the Debtor.

# ARTICLE XIV.

## RETENTION OF JURISDICTION

14.1   **Retention of Jurisdiction by the Bankruptcy Court.**

(a)     By operation of the Plan, the Bankruptcy Court, pursuant to Sections 105(a) and 1142 of the Bankruptcy Code, shall retain jurisdiction over the Chapter 11 Case:

(1)     to hear and determine pending motions for the assumption or rejection of executory contracts or unexpired leases or the assumption and assignment, as the case may be, of executory contracts or unexpired leases to which the Debtor is a party or with respect to which the Debtor may be liable, and to hear and determine the allowance of Claims resulting therefrom including cure amounts, if any, required;

(2)     to hear and determine any and all objections to the allowance or estimation of Claims;

(3)     to hear and determine the Adversary Proceeding and to hear and determine such other litigation or motions as may have been commenced in the Bankruptcy Court by the Debtor or the Committee before the Effective Date or by the Reorganized Debtor Subcommittee on behalf of the Reorganized Debtor or by the Disbursing Agent after the Effective Date (including without limitation all Causes of Action and all Retained Claims and Defenses and the Interpleader Proceeding, if the Reorganized Debtor is required to file the Interpleader Proceeding), whether to collect assets of the Debtor or for other purposes;

(4)     to enter and implement such orders as may be appropriate if the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(5)     to hear and determine applications for allowance of professional fee claims and all other applications for fees or reimbursement of expenses under the Plan or under Sections 330, 331, 503(b), 1103 and 1129(a)(4) of the Bankruptcy Code;

(6)     to determine requests for the payment of Claims by the Disbursing Agent at the request of the Reorganized Debtor Subcommittee under Section 507(a)(1) of the Bankruptcy Code, including compensation and expenses of parties entitled thereto; and

(7)     promptly after satisfaction of the matters set forth in (a) (1) through (6) hereof, to enter a final decree closing the Chapter 11 Case.

# ARTICLE XV.

## MISCELLANEOUS PROVISIONS

### 15.1   **Modification and Amendments.**

The Debtor and the Committee may jointly alter, amend or modify the Plan in accordance with Section 1127(a) of the Bankruptcy Code at any time prior to Confirmation. On and after the Confirmation Date, but prior to substantial consummation of the Plan as defined in Section 1101(2) of the Bankruptcy Code, the Debtor and the Committee (jointly prior to the Effective Date) or the Reorganized Debtor Subcommittee (after the Effective Date) may, under Section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of the Plan, so long as such proceedings do not materially adversely affect the treatment of holders of Claims or Interests under the Plan; provided, however, that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or any orders of court.

### 15.2   **Revocation, Withdrawal or Non-Consummation.**

The Debtor and the Committee shall jointly have the right to revoke or withdraw the Plan at any time prior to the Effective Date. If revoked or withdrawn prior to the Effective Date, or if the Confirmation Date or the Effective Date does not occur, then the Plan, any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Class), the assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed or to be executed pursuant to the Plan shall be null and void and of no effect. In such event, nothing contained herein, and no acts taken to implement the Plan, shall be deemed to constitute a waiver or release of any Claims against the Debtor or any other Person or any claims by the Debtor or the Debtor against any Person, to prejudice in any manner the rights of the Debtor, the Committee or any Person in any further proceedings involving the Debtor or to constitute an admission of any sort by the Debtor or the Committee or any other Person.

### 15.3   **Binding Effect: Successors and Assigns.**

On the Effective Date, the Plan shall be binding upon, and inure to the benefit of, the Debtor and all present and former holders of Claims or Interests, and their respective successors and assigns, whether or not the Claims or Interests of such holders are Impaired under the Plan and whether or not such holders have accepted the Plan.

### 15.4   **Exclusivity.**

The Debtor and the Committee shall jointly have the exclusive right to amend or modify the Plan and to solicit acceptances of any amendments or modifications through the Effective Date.

15.5   **Notices.**

Any notice required or permitted under this Plan shall be (a) in writing, (b) served by (i) certified mail, return receipt requested, (ii) hand delivery, or (iii) overnight delivery service, and (c) deemed to have been given or made when actually delivered, to the following addresses:

If to the Debtor, to:

Wolf Creek Properties, LLC
P.O. Box 658
Eden, UT 84310
Attn: Rob Thomas

with a copy to Debtor's Counsel at:

Blake D. Miller
James W. Anderson
Miller Guymon, P.C.
165 Regent Street
Salt Lake City, UT 84111

If to the Committee, to Committee Counsel at:

Michael Johnson
Ray Quinney & Nebeker P.C.
36 South State Street, 14th Floor
P.O. Box 45385
Salt Lake City, Utah  84145-0385

If to the Reorganized Debtor Subcommittee, to:

Ron Rubin, Chairperson
c/o Michael Johnson
Ray Quinney & Nebeker P.C.
36 South State Street, 14th Floor
P.O. Box 45385
Salt Lake City, Utah  84145-0385

15.6   **Severability of Plan Provisions.**

In the event that the Bankruptcy Court determines, prior to the Effective Date, that any provision in the Plan is invalid, void or unenforceable, the Debtor and the Committee may jointly, at their discretion, (a) treat such provision as invalid, void or unenforceable, in which case such provision shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan, or (b) alter, amend, revoke, or withdraw the Plan.

15.7    **Governing Law; Construction.**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated in any agreement, document or instrument executed in connection with the Plan, the substantive and procedural laws of the State of Utah shall govern the construction and implementation of the Plan, and any Plan Agreements, documents and instruments executed in connection with the Plan, without reference to any conflict or choice of laws principles. To the extent the provisions of the Plan conflict with the terms and conditions of any other agreement, document or instrument executed in connection herewith, the provisions of the Plan shall govern.

15.8    **Notice of Effective Date.**

The Reorganized Debtor Subcommittee on behalf of the Reorganized Debtor shall give notice of the occurrence of the Effective Date to all Creditors and parties in interest which states all relevant bar dates set forth in this Plan.

DATED this 21st day of March, 2012.

**Wolf Creek Properties, LC, Debtor and Debtor in Possession**

By: /s/ Rob Thomas
       Member, Board of Managers

MILLER GUYMON, P.C.

/s/ Blake D. Miller
Blake D. Miller
James W. Anderson
*Counsel for the Debtor and Debtor in Possession*

**Official Committee of the Unsecured Creditors
of Wolf Creek Properties, LC**

By:  /s/ Ron Rubin_____
       Ron Rubin, Chair

RAY QUINNEY & NEBEKER P.C.

/s/ Douglas M. Monson_____
Michael R. Johnson
Douglas M. Monson
Brent D. Wride
*Counsel for the Unsecured Creditors Committee*

1171930.05/dmm